734 A.2d 752

JOHN D. MILLER, II, PLAINTIFF–RESPONDENT, v. MARGARET
C. MILLER, DEFENDANT–APPELLANT.

Argued March 2, 1999—Decided July 15, 1999.

409

410

411

*James P. Yudes,* argued the cause for appellant (*Mr. Yudes,* attorney; *Mr. Yudes, Kevin M. Mazza* and *Holly M. Friedland,* on the briefs).

*Frederick J. Sikora,* argued the cause for respondent (*Mr. Sikora,* attorney; *Mr. Sikora* and *James J. Moloughney,* on the brief).

The opinion of the Court was delivered by

COLEMAN, J.

This appeal involves cross-applications to modify an alimony award based on changed circumstances of the supporting spouse. The critical issue raised is whether income should be imputed from a supporting spouse's investments for the purpose of determining his or her ability to pay alimony pursuant to an agreement. The trial court and the Appellate Division declined to impute income from the supporting spouse's investments. We granted defendant's petition for certification. 157 *N.J.* 541, 724 *A.2d* 801 (1998). We hold that additional income should be imputed from the supporting spouse's investments.

I

Plaintiff John D. Miller, II, and defendant Margaret C. Miller were married on July 29, 1967. Two children were born of the marriage: Melissa, who was twenty-six years old and emancipated at the time of trial, and John, who was twenty-two years old at the time of trial and attending college. The parties were divorced in 1988.

When plaintiff filed the complaint for divorce in early 1987, he was employed as Manager of Municipal Markets at Merrill Lynch. Defendant was a housewife throughout her marriage to plaintiff. Plaintiff was earning an annual salary of approximately $150,000 when he filed the complaint. As a part of his compensation package, plaintiff also received an annual bonus based on his performance and the overall profitability of Merrill Lynch. In

1987, plaintiff's bonus peaked at $1,100,000. In addition to his salary and bonus, part of plaintiff's compensation package included an expectancy in an unspecified amount of restricted Merrill Lynch stock.

The parties reached a property settlement agreement in 1988 as part of the divorce proceedings. The settlement provided that plaintiff would pay alimony to defendant consisting of half of his monthly take-home salary, which at that time entitled defendant to a monthly payment of $3,750, and half of the first $300,000 of his annual bonus, provided that the alimony would not exceed $200,000 annually. As part of the settlement agreement, defendant waived her right to receive a portion of 10,000 shares of restricted Merrill Lynch stock that plaintiff had already received by way of bonus for work performed during 1987, as well as any other shares plaintiff would receive as a part of his compensation package in the future. All other marital assets were distributed equally, each party receiving approximately $1,000,000 in the equitable distribution. From 1988 through 1992, defendant received close to the maximum alimony payments permitted by the settlement agreement.[1]

On December 23, 1991, plaintiff became ill and discovered that he had a heart condition. After being out of his office during the first two months in 1992, he assumed a new position at Merrill Lynch as a consultant to Municipal Markets. Plaintiff requested that change of position because his responsibilities as Manager of Municipal Markets were too stressful for him. He was paid the same base salary as before, and he believed that he was eligible for a bonus as well.

---

[1] In 1988, plaintiff's salary and bonuses totaled $859,354, and defendant received $194,493 in alimony. In 1989, plaintiff's salary and bonus totaled $1,323,838, and defendant received $193,700 in alimony. In 1991, plaintiff's salary and bonuses totaled $1,974,310, and defendant received $203,307 in alimony. In 1992, plaintiff's salary and bonus reached a peak of $5,684,004 due, in part, to the vesting of the restricted stocks. That year, defendant received $199,277 in alimony.

Contrary to plaintiff's expectations, he did not receive a bonus for work performed during the years 1992 or 1993. Plaintiff received his last paycheck from Merrill Lynch on May 30, 1994. In November 1994, plaintiff filed a complaint with the Equal Employment Opportunity Commission (EEOC) charging Merrill Lynch with discrimination on the basis of age, disability, and retaliation. In January 1995, plaintiff was terminated by Merrill Lynch.

Plaintiff fell behind in his alimony payments starting in 1993. During that year, defendant sought to compel plaintiff to pay alimony arrearages, to modify the Final Judgment of Divorce, and to discover plaintiff's income. Defendant was permitted to obtain limited discovery of plaintiff's income. After discovery was complete, the trial court conducted a plenary hearing pursuant to *Lepis v. Lepis,* 83 *N.J.* 139, 416 *A.*2d 45 (1980), to determine whether plaintiff's circumstances had changed in such a way that would warrant a reduction in plaintiff's alimony obligation.

At the conclusion of the plenary hearing, the trial court determined that plaintiff's termination from Merrill Lynch was involuntary, constituting changed circumstances under *Lepis.* The trial court found that there was no proof that plaintiff conspired with Merrill Lynch to receive the restricted stock in lieu of cash bonuses in order to reduce his alimony payments to defendant.

The court also found that under the parties' property settlement agreement, the maximum amount of alimony that defendant was entitled to receive was contingent upon plaintiff's salary and bonuses, capping the alimony at $200,000 per year. The trial court noted that there was

> nothing in the [original property settlement] agreement that even hints that the defendant had a guarantee of $200,000 per year alimony[,] but rather the inescapable conclusion from any fair reading of the agreement is that if the plaintiff received no bonus the defendant's alimony would be a maximum of 50% of the plaintiff's net Merrill Lynch salary.

The trial court also found that the agreement was not unconscionable because defendant had more than adequate legal representation during both the original settlement negotiations and

throughout the present matter. Defendant acknowledged that the terms and consequences of the agreement, including the alimony provision and her waiver of the restricted stock, were explained to her prior to executing the agreement.

On the issue of plaintiff's ability to pay alimony to defendant, the trial court found that plaintiff had experienced "a substantial change in circumstances which is not temporary in nature." The trial court found that plaintiff had a net worth of $6,561,644, $4.5 million of which was liquid. The trial court also noted that plaintiff had $1.5 million invested in Municipal Bonds, yielding a tax-free income of $87,500 per year. Plaintiff had invested approximately $3,000,000 in various growth stocks, paying interest and dividends of approximately $50,000 per year. Plaintiff's annual income from all of his investments totaled approximately $137,-500. The trial court also determined that plaintiff was capable of earning $100,000 per year through self-employment, independent consulting, or regular employment.

In contrast, the trial court found that defendant earned $40,000 in 1994 as an interior decorator. Her assets included a home worth approximately $425,000, a Smith Barney Investment Account containing $723,801, and $14,000 in an individual retirement account (IRA). Defendant's claimed expenses of $173,216 per year were found to be inflated and unreasonable. Because of the changed circumstances, the trial court concluded that "both parties cannot maintain the same standard that they did at the time of the divorce without having the plaintiff deplete his substantial assets which have been gained since the dissolution of the marriage."

Based on the foregoing determinations, the trial court reduced the alimony from $200,000 per year to $48,000 per year, which would have been approximately one-half of plaintiff's imputed yearly net salary had he still been employed by Merrill Lynch. In arriving at its decision, the trial court considered (1) defendant's employment and investment income, (2) plaintiff's investment income, and (3) the fact that defendant will share in plaintiff's

Merrill Lynch pension. As a part of its ruling, the trial court also required that plaintiff either purchase a $250,000 life insurance policy or pay the equivalent sum for defendant's benefit in the event of his death. Finally, plaintiff was required to pay their son's college expenses, as well as defendant's attorney's fees.

The Appellate Division, in an unpublished opinion, affirmed the trial court's decision in its entirety, finding sufficient credible evidence in the record to support the trial court's findings. We now modify and affirm.

## II

Defendant argues that the trial court erred in its calculation of her alimony award because it failed to identify and take into consideration all of plaintiff's passive income, including income earned from plaintiff's extensive investment portfolio. Defendant maintains that regardless of plaintiff's employment status, he is still able to provide her with $200,000 per year in alimony because of his extensive investment portfolio. She contends that although plaintiff's current investment portfolio represents a significant source of income, his experience as a savvy investor could earn him much more investment income than the $137,000 considered by the trial court.

Defendant argues further that the trial court erred in failing to reform the original property settlement agreement based on its inherent inequity. She insists that the property settlement agreement is unconscionable and should therefore be reformed by the courts.

Plaintiff, in contrast, argues that computing the potential yield of his investments is an overly complicated task that the courts should not undertake. Plaintiff contends that defendant's argument regarding her alimony award applies only to his liquid assets and not to his investment portfolio. He maintains that the property settlement agreement is not unconscionable because it was fully negotiated and defendant waived her rights to the

restricted Merrill Lynch stock after consultation and advice from her attorneys and accountant.

## III

### -A-

First, we decide whether the original property settlement agreement should be reformed because, as defendant argues, it is unconscionable. At the time of the original settlement negotiations, defendant waived her rights to plaintiff's restricted Merrill Lynch stock (which had not yet vested). Defendant essentially argues that she did not have the requisite information to make an informed decision regarding her waiver of the restricted stock. She also contends that she waived her rights to the restricted stock in consideration for $200,000 annually in alimony payments. She contends that because plaintiff is not paying alimony similar to the amount he paid between 1988 and 1992 because his income from salary has declined, even though he has become a multimillionaire, the original property settlement agreement should be reformed.

The equitable authority of courts to modify property settlement agreements executed in connection with divorce proceedings is well established. *Conforti v. Guliadis,* 128 *N.J.* 318, 323, 608 *A.*2d 225 (1992); *Carr v. Carr,* 120 *N.J.* 336, 346–49, 576 *A.*2d 872 (1990); *Rothman v. Rothman,* 65 *N.J.* 219, 229, 320 *A.*2d 496 (1974). The agreement must reflect the strong public and statutory purpose of ensuring fairness and equity in the dissolution of marriages. *Petersen v. Petersen,* 85 *N.J.* 638, 644, 428 *A.*2d 1301 (1981).

In most of the cases in which our courts have reformed existing property settlement agreements based on unconscionability, there were more egregious circumstances than those presented in this case. *See, e.g., Guglielmo v. Guglielmo,* 253 *N.J.Super.* 531, 542, 602 *A.*2d 741 (App.Div.1992) (reforming original property settlement where wife, who was not savvy in financial matters, was

represented by attorney who was close relative of husband and represented husband before and after divorce). Matrimonial agreements may also be reformed when, through a common mistake, or mistake of one party accompanied by concealment of the other, the agreement fails to express the real intent of the parties. *Capanear v. Salzano,* 222 *N.J.Super.* 403, 407, 537 *A.*2d 306 (App.Div.1988).

■ In the present case, defendant was represented in the negotiations of the settlement agreement by two prominent lawyers in the field of family law as well as advised by an accountant. Moreover, before the trial court accepted the settlement agreement, it repeatedly asked defendant whether she understood the agreement and whether she was rushed in her decision. She informed the court that she fully understood the agreement and that she was not rushed into signing it. That agreement provided defendant with approximately $1,000,000 in assets, as well as a share of plaintiff's pension upon his retirement. This is not a case in which the supported spouse has asserted allegations of fraud or overreaching. *See Von Pein v. Von Pein,* 268 *N.J.Super.* 7, 15–17, 632 *A.*2d 830 (App.Div.1993). Given the absence of unconscionability, fraud, or overreaching in the negotiations of the settlement, we agree with the trial court that no legal or equitable basis exists to reform the parties' property settlement agreement.

-B-

■ Although we decline to reform the property settlement agreement, we must nonetheless determine whether there should be a modification of alimony based on imputed income from plaintiff's investments. The duties of former spouses regarding alimony are always subject to review or modification by our courts based upon a showing of changed circumstances. *Lepis, supra,* 83 *N.J.* at 145, 416 *A.*2d 45; *Berkowitz v. Berkowitz,* 55 *N.J.* 564, 569, 264 *A.*2d 49 (1970).

In *Lepis* we set forth the standards to be applied in determining whether the duties of the supporting spouse should be modified. 83 *N.J.* at 151–52, 416 *A.*2d 45. The party moving for the modification bears the burden of making a *prima facie* showing of changed circumstances. *Id.* at 157–59, 416 *A.*2d 45. Upon such a showing, a court may order discovery and hold a hearing to determine the supporting spouse's ability to pay. *Ibid.* Changed circumstances such as child maturation, increases in need, employment, or child emancipation may result in a modification of support. *Id.* at 152, 416 *A.*2d 45; *Grotsky v. Grotsky,* 58 *N.J.* 354, 356–57, 277 *A.*2d 535 (1971).

The standard that governs an application for modification of a property settlement agreement is the same standard that applies at the time of the original judgment of divorce. "When support of an economically dependent spouse is at issue, the general considerations are the dependent spouse's needs, that spouse's ability to contribute to the fulfillment of those needs, and the supporting spouse's ability to maintain the dependent spouse at the former standard." *Lepis, supra,* 83 *N.J.* at 152, 416 *A.*2d 45. As part of the considerations governing a modification, a court may also take into account assets received by either party in the equitable distribution of the marital property. *Id.* at 153, 416 *A.*2d 45.

In an application brought by a supporting spouse for a downward modification in alimony, such as the present case, the central issue is the supporting spouse's ability to pay. A supporting spouse's potential to generate income is a significant factor to consider when determining his or her ability to pay alimony. *Mahoney v. Mahoney,* 91 *N.J.* 488, 505, 453 *A.*2d 527 (1982); *Stern v. Stern,* 66 *N.J.* 340, 345, 331 *A.*2d 257 (1975). Although the supporting spouse's income earned through employment is central to the modification inquiry, it is not the only measure of the supporting spouse's ability to pay that should be considered by a court. Real property, capital assets, investment portfolio, and capacity to earn by "diligent attention to ... business" are all

appropriate factors for a court to consider in the determination of alimony modification. *Innes v. Innes,* 117 *N.J.* 496, 503, 569 *A.*2d 770 (1990) (quoting *Bonanno v. Bonanno,* 4 *N.J.* 268, 275, 72 *A.*2d 318 (1950)). We have never suggested that the supporting spouse's income earned from investments should be barred from this calculus.

Income is traditionally defined as realized monetary gain from employment or investment. *See Webster's New International Dictionary* 1143 (3d ed.1971). In the taxation context, the United States Supreme Court has defined income as " 'the gain derived from capital, from labor, or from both combined,' provided it be understood to include profit gained through a sale or conversion of capital assets." *Eisner v. Macomber,* 252 *U.S.* 189, 207, 40 *S.Ct.* 189, 193, 64 *L.Ed.* 521, 528 (1920) (quoting *Doyle v. Mitchell Bros. Co.,* 247 *U.S.* 179, 185, 38 *S.Ct.* 467, 469, 62 *L.Ed.* 1054, 1059 (1918)). Under that definition, only gains that are actually realized are considered income for taxation purposes.

Defendant urges us to adopt a different definition of income for the purpose of calculating and modifying alimony awards than the one used in the taxation context. Defendant argues that plaintiff chose both the form of his investments (stocks, bonds and other investment vehicles) and the manner in which income is realized. Defendant maintains that income investments are "designed to provide an investor with a fixed, steady stream of income, with the investment vehicle remaining at a specified value." In contrast, " 'growth' income investments are designed to produce income through appreciation in stock values." The majority of plaintiff's investments fall into the growth category, making him equity rich but "alimony poor." Defendant argues that plaintiff's decision to invest for capital gains rather than have a larger steady stream of income should not justify a reduction in her alimony. Defendant contends that the definition of income for alimony calculation purposes should encompass the *potential* income which could be realized from the supporting spouse's investments. She argues that potential, although yet unrealized, income from plaintiff's

investments should be imputed to plaintiff in much the same way as income earned through employment is imputed to an unemployed or underemployed supporting spouse. *See Bonanno, supra,* 4 *N.J.* at 275, 72 *A.2d* 318 (stating capacity to earn or prospective earnings should be taken into consideration in alimony awards); *Stiffler v. Stiffler,* 304 *N.J.Super.* 96, 101, 698 *A.2d* 549 (Ch.Div.1997) (stating "[s]upport orders are primarily based not so much on the actual income of the parties but on their potential to generate income"); *Harris v. Harris,* 235 *N.J.Super.* 434, 439–40, 563 *A.2d* 64 (Ch.Div.1989), *overruled on other grounds by Ohlhoff v. Ohlhoff,* 246 *N.J.Super.* 1, 586 *A.2d* 839 (App.Div.1991) (stating defendant who alleged inability to find employment in chosen field should be denied downward modification in alimony).

■■■ New Jersey courts have consistently held that a supporting spouse's assets may be considered in calculating an alimony award. *See Innes, supra,* 117 *N.J.* at 503, 569 *A.2d* 770; *Bonanno, supra,* 4 *N.J.* at 274, 72 *A.2d* 318; *Aronson v. Aronson,* 245 *N.J.Super.* 354, 363–64, 585 *A.2d* 956 (App.Div.1991); *Stiffler, supra,* 304 *N.J.Super.* at 101, 698 *A.2d* 549. Although some assets may be exempt from those subject to equitable distribution (such as an inheritance), income derived from those excludable assets may be considered in the initial alimony decision or modification of an alimony award. *See Aronson, supra,* 245 *N.J.Super.* at 363–64, 585 *A.2d* 956.

■■■ Additionally, courts have held that a supporting spouse cannot insulate his or her assets from the alimony calculus by investing those assets in a non-income producing manner. *Stiffler, supra,* 304 *N.J.Super.* at 102, 698 *A.2d* 549. In *Stiffler,* the supporting spouse invested an inheritance he received in a home, a non-income producing asset. *Id.* at 103, 698 *A.2d* 549. The value of that home exceeded the value of the original marital home shared by the parties. *Ibid.* The Appellate Division concluded that "the funds utilized to increase [the supporting spouse's] lifestyle should be imputed to have been invested in order to generate income." *Ibid.* Based on that reasoning, the court

imputed interest income to the supporting spouse in the amount of six percent per year on the funds that he used to purchase a significantly more extravagant home. *Ibid.*

 Given that both income earned through employment and investment income may be considered in a court's calculation of an alimony award, it follows that there is no functional difference between imputing income to the supporting spouse earned from employment versus that earned from investment. In both instances, the supporting spouse is required to earn more from an "asset," either his or her human capital in the form of employment or his or her investment capital, or risk having more income imputed to him or her. The rationale supporting the imputation of income that could be earned from employment is that the supporting spouse could be investing his or her human capital in a more productive way by obtaining employment consistent with his or her marketable skills and training, or obtaining more or better employment, market conditions permitting, in the case of underemployed supporting spouses. *See, e.g., Harris, supra,* 235 *N.J.Super.* at 439–40, 563 *A.*2d 64; *Arribi v. Arribi,* 186 *N.J.Super.* 116, 118, 451 *A.*2d 969 (Ch.Div.1982). In the present case, the trial court found that plaintiff had accumulated sufficient human capital in the form of education and experience to obtain employment that would provide him with employment income of $100,000 per year even though he was not employed.

Based on the foregoing principles, plaintiff, as the supporting spouse, could invest his substantial capital assets to yield more than the approximately 1.6 percent interest he is currently earning on his growth stock investments. Doing so would not require that plaintiff deplete his considerable principal; it only means that plaintiff could invest his principal differently in higher yield investment options available to him, much in the same way that an underemployed spouse could obtain a higher paying job available to him to make a more productive use of his human capital. In this case, plaintiff's sophisticated investment skills are to him what Luciano Pavarotti's voice is to him: the "asset" that is capable of

earning a significant amount of money. In other cases, the use of an investment broker will lead to the same results because the supporting spouse still makes the ultimate investment decision.

Plaintiff argues that it would be difficult for the courts to compute imputed income from different types of investments. However, whether making the initial determination or modifying alimony awards, our courts often calculate imputed income from different occupations and employment contexts in the case of unemployed or underemployed supporting spouses. The calculation of imputed income from investments is equally within our courts' capabilities. The "mere difficulty in determining the quantum of value of a party's claim is no reason to bar that claim if it is otherwise established." *Whitfield v. Whitfield,* 222 *N.J.Super.* 36, 47, 535 *A.*2d 986 (App.Div.1987). Although the bench and bar will have to perform additional work in fine tuning the complex process of imputing income from some of the more sophisticated investments, "justice cannot 'sit ... by and be flaunted in case after case before a remedy is available.'" *State v. Gilmore,* 199 *N.J.Super.* 389, 409, 489 *A.*2d 1175 (App.Div.1985), *aff'd,* 103 *N.J.* 508, 511 *A.*2d 1150 (1986) (quoting *Commonwealth v. Martin,* 461 *Pa.* 289, 299, 336 *A.*2d 290 (1975) (Nix, J., dissenting)).

We conclude, therefore, that in the present case, it is appropriate to impute a reasonable income from plaintiff's investments comparable to a prudent use of his investments, like his human capital. The question that remains, however, is what rate of return should be applied to plaintiff's investment decisions. Either a fixed or a variable rate can be used. We prefer a variable rate because it is more equitable in that it accommodates market fluctuations. A variable rate, however, must be ascertainable by reference to a formula or a fixed index.

We conclude that the fairest solution for imputing income to plaintiff's investments under the present circumstances is to impute a rate of return based on long-term corporate bonds. This rate should be based upon Moody's Composite Index on A-rated

Corporate Bonds.[2] Although historically stocks have performed better than bonds, it would not be equitable to impute the average annual twelve percent growth rate of stocks to plaintiff's investments because of the inherent risks involved in stock market investments. The rate on long-term A-rated corporate bonds, on the other hand, provides a prudent balance between investment risk and investment return.

On remand, the trial court should use Moody's Composite Index on A-rated Corporate Bonds to impute the average long-term corporate bond rate of return over the preceding five years.[3] The average for each of the last five calendar years was: 1994, 8.73%; 1995, 7.83%; 1996, 7.59%; 1997, 7.54%; 1998, 6.93%. Thus the average rate for the last five calendar years was 7.7%. Counsel for the parties are to provide that information to the court. The 7.7% average rate is not inconsistent with the rate of return that our and other courts have imputed to a supporting spouse's investments and other capital assets. *See, e.g., Stiffler, supra,* 304 *N.J.Super.* at 103, 698 *A.*2d 549 (imputing interest income to supporting spouse at the rate of six percent per year); *Barrett v. Barrett,* 963 *S.W.*2d 454, 456 (Mo.Ct.App.1998) (imputing a five to six percent annual interest rate to wife's income producing assets).

We emphasize that our holding today does not suggest that plaintiff must actually invest all of his substantial assets in choice long-term corporate bonds. To the contrary, we recognize that plaintiff is an experienced investor who gained great knowledge of financial matters through his employment at Merrill Lynch. He may choose to diversify his investment portfolio over many different types of investment options. We do not intend to

---

[2] Agencies like Standard & Poor's and Moody's generally rate bonds in two broad categories: investment grade and speculative grade.

[3] If for some unforeseeable reason the required information cannot be obtained from Moody's within a reasonable time, the trial court should direct counsel to use another comparable source such as Lehmann Brothers' Five–Year Average on T–Bonds Index.

deprive plaintiff of the opportunity to control his investment options. We simply require the imputation of a more reasonable income from those investments by applying the average historical rate on A-rated long-term corporate bonds on all of his investments. A contrary holding would not be consistent with our strong statutory and public policy of ensuring fairness and equity in the dissolution of marriages. Under our holding, the trial court must consider the imputed investment income in the same way as income from salary and bonuses earned from employment in determining how much alimony is due and owing under the agreement. The $200,000 cap on alimony remains valid and enforceable.

IV

We hold that the parties' original property settlement agreement should not be reformed based upon defendant's allegation of unconscionability. We also hold that annual income should be imputed from all of plaintiff's investments based upon the average pending five-year historical rate of return on A-rated long-term corporate bonds. Consequently, the decision of the Appellate Division is modified and affirmed. We remand the matter to the Family Part for further proceedings consistent with this opinion.

*For modification, affirmance and remandment*—Chief Justice PORITZ and Justices HANDLER, POLLOCK , O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.