919 A.2d 885 (2007)
392 N.J. Super. 58
Vincent J. ADDESA, Plaintiff-Appellant/Cross-Respondent,
v.
Glenine ADDESA, Defendant-Respondent/Cross-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued October 25, 2006.
Decided April 13, 2007.
*888 Bonnie C. Frost, Denville, argued the cause for appellant/cross-respondent (Einhorn, Harris, Ascher, Barbarito, Frost & Ironson, attorneys; Ms. Frost, on the brief).
Clifford J. Weininger argued the cause for respondent/cross-appellant (Clifford J. Weininger and Associates, attorneys; Joseph J. Fritzen, Denville, on the brief).
Before Judges STERN, COLLESTER and MESSANO.
The opinion of the court was delivered by
STERN, P.J.A.D.
Plaintiff appeals from a post-judgment order of April 7, 2005, which vacated an order of December 27, 2004, corrected certain calculations therein, and awarded defendant $1,706,511.19 in equitable distribution,[1] together with counsel fees and costs that were subsequently embodied in orders of June 1, 2005 (for $140,955.17) and October 18, 2005 (for $1,500).[2] The orders relating to equitable distribution were based on Judge James Farber's decision of December 27, 2004 and his statement of reasons filed on April 7, 2005, the latter of which also addressed the reasons he decided to award counsel fees. Plaintiff also appeals from the December 27, 2004 order to the extent that it vacates the parties' property settlement agreement ("PSA") "as it relates to equitable distribution of the components of plaintiff's business, i.e., MSI [Communications, Inc.] [("MSI")], Jersey State Properties [("JSP")], and *889 the MSI Employee Stock Option Plan [("ESOP")]."
Defendant cross-appeals from the same orders with respect to the dates used to determine equitable distribution and Judge Farber's failure to find plaintiff liable for equitable and common law fraud.
The December 27, 2004 and April 7, 2005 orders were premised on an evidentiary hearing conducted by Judge Farber as a result of an order of another judge filed on November 7, 2000, setting aside the PSA as to "all issues of equitable distribution and support[,]" and ordering a trial on those issues. Plaintiff argues that (1) "the decision of [the first judge] was plainly incorrect, was based on the mediator's file and the mediator's deposition and, therefore, the agreement reached in mediation should have been enforced";[3] (2) "Judge Farber erred in not reconsidering [the first judge's] decision and in not enforcing the mediated agreement" after hearing defendant testify in a manner inconsistent with her certification that resulted in [the first judge's] decision; (3) Judge Farber's findings were erroneous and failed to explain why the real estate, business, and ESOP were divided equally; and (4) counsel fees were improperly awarded to defendant.
On her cross-appeal, defendant contends that (1) "the trial court erred in refusing to use the known value of MSI Communications, Inc. in awarding [her] equitable distribution"; (2) the court also "erred in refusing to consider the contract price and actual proceeds received from the post-complaint sale of the Jersey State Properties[,] LLC building in awarding equitable distribution"[4]; and (3) "judicial estoppel precludes appellant's challenge to the 50/50 distribution of marital property set forth in the parties' agreement."
We conclude that the first judge appropriately ordered that a plenary hearing be conducted as a result of defendant's attack on the PSA resulting from the mediation, even though the order requiring the mediator's deposition and examination of his file was inappropriate. In so holding, we recognize that private mediations must remain confidential or they will have no beneficial impact. State v. Williams, 184 N.J. 432, 444-52, 877 A.2d 1258 (2005) (stating in dictum that the criminal defendant's need for the mediator's testimony did not outweigh the need for confidentiality); Lehr v. Afflitto, 382 N.J.Super. 376, 395, 889 A.2d 462 (App.Div.2006) (in mediation conducted under court rule, R. 1:40-5, confidentiality required by R. 1:40-4(c) "did not substantially outweigh the private and public interests in protecting confidentiality"). This is particularly so because the mediation agreement in this case specifically provided for confidentiality.[5] We further conclude that there is no basis for distinguishing between uncounselled mediated agreements and other types of PSAs in terms of evaluating conscionability, and Judge Farber's independent finding of unconscionability after the plenary hearing was, in any event, properly based on the record developed before him, as opposed *890 to the first judge's evaluation of the mediation. As such, we reject the appeal and cross-appeal, believe the result is essentially fair, and, based on our scope of review, affirm the judgment.

I.
On January 22, 1999, the parties entered into a mediation agreement with a private mediator resulting in a PSA executed on June 16, 1999. At the time, neither party was represented by counsel. Plaintiff subsequently filed a complaint for divorce on August 23, 1999, and a judgment was entered on May 24, 2000, which incorporated the PSA.
There is no dispute that courts possess the equitable authority to modify privately negotiated property settlement agreements. Conforti v. Guliadis, 128 N.J. 318, 323, 608 A.2d 225 (1992). This is because such agreements "must reflect the strong public and statutory purpose of ensuring fairness and equity in the dissolution of marriages." Miller v. Miller, 160 N.J. 408, 418, 734 A.2d 752 (1999). While spousal agreements are presumed valid, only those agreements that are "fair and just" will be enforced. See Petersen v. Petersen, 85 N.J. 638, 642, 428 A.2d 1301 (1981). A spousal agreement may be reformed when it is "unconscionable," "it is the product of fraud or overreaching by a party with power to take advantage of a confidential relationship," Dworkin v. Dworkin, 217 N.J.Super. 518, 523, 526 A.2d 278 (App.Div.1987), or when, due to "common mistake [] or mistake of one party accompanied by concealment of the other, the agreement fails to express the real intent of the parties[.]" Miller, supra, 160 N.J. at 419, 734 A.2d 752.

II.
We first address whether the first judge erred in ordering discovery of the mediator and if that makes her subsequent order of an evidentiary hearing improper. Plaintiff argues that mediation proceedings are confidential and the first judge inappropriately compelled the mediator to testify regarding what occurred at the mediation proceedings in order to evaluate whether there was a basis for disturbing the PSA. Plaintiff's argument is supported by the parties' mediation agreement, which expressly provided that
(c) To preserve the integrity of the mediation process, both clients agree that neither the mediator nor his records shall be subject to subpoena by either or both of the clients or by anyone acting on behalf of either or both clients, should either or both clients choose to litigate this matter subsequent to or in place of mediation. Each of the clients makes this covenant with the other as a condition of their agreement with one another to attempt to resolve this matter through mediation. Each client also makes this covenant with the mediator to induce the mediator to furnish mediation services under this Agreement.
We agree with plaintiff's contention based on the terms of the agreement. Moreover, plaintiff's position is also supported by subsequently developed public policy.
In November 2004, more than five years after the parties signed the agreement and four years after entry of the judgment of divorce, the Legislature enacted the Uniform Mediation Act ("UMA"), N.J.S.A. 2A:23C-1 to13. The statute applies to mediations required "by statute, court rule or administrative agency rule, or []referred to mediation by a court, administrative agency, or arbitrator[.]" N.J.S.A. 2A:23C-3(a)(1). If the agreement before us were entered after the statute was enacted, the UMA would apply to this case *891 by virtue of the parties' agreement. See N.J.S.A. 2A:23C-3(a)(2),(3).
N.J.S.A. 2A:23C-5(a) provides that the confidentiality attaching to a mediation may be waived only if all of the parties to the mediation "expressly" agree to the waiver. However, the UMA provides exceptions to the broad rule of section 5(a), reflecting our present public policy and providing that
[t]here is no privilege . . . if a court. . . . finds, after a hearing in camera, that the party seeking discovery or the proponent of the evidence has shown that the evidence is not otherwise available, that there is a need for the evidence that substantially outweighs the interest in protecting confidentiality, and that the mediation communication is sought or offered in:
. . . .
(2) . . . a proceeding to prove a claim to rescind or reform or a defense to avoid liability on a contract arising out of the mediation.
[N.J.S.A. 2A:23C-6(b).]
But even then, "[a] mediator may not be compelled to provide evidence of a mediation communication[.]" N.J.S.A. 2A:23C-6(c). See also N.J.S.A. 2A:23C-2 (definition of "mediation communication").
Under the mediation agreement executed by the parties in this case, independent of the subsequently adopted public policy embodied in the UMA regarding court ordered mediations, the first judge should not have ordered or required the mediator to appear and testify as to the communications and disclosures made to him during the mediation. See Williams, supra, 184 N.J. 432 at 444-45, 877 A.2d 1258 (although not in effect at the time the case was tried, UMA principles provide "an appropriate analytical framework for the determination whether defendant can overcome the mediator's privilege not to testify[]"); see also Lehr, supra, 382 N.J.Super. at 392-95, 889 A.2d 462 (applying UMA principles in case decided before the passage of that Act). Accordingly, we accept plaintiff's argument that review of the mediator's file and the ordering and consideration of the mediator's deposition testimony was inappropriate. As a result, we neither refer to, recite, nor consider that evidence.

III.
We nevertheless affirm the first judge's order requiring a plenary hearing. The papers submitted in November 2000 on the "motion to set aside the property settlement agreement" and for a plenary hearing were sufficient to warrant a hearing as to defendant's knowledge and receipt of the financial information during the mediation and the unconscionability of the PSA. The parties' respective certifications raised a number of factual issues on these points. Specifically, in her certification, defendant asserted that, at the mediation, plaintiff wrongly "led her to believe" that MSI and JSP were worth only $642,920 and $298,896, respectively, when he knew that they were worth far more as evidenced by MSI's subsequent sale price of $16,000,000 in October 2000, just over a year after the PSA was executed, and that the assessed value of the building owned by JSP was $512,000.[6] *892
Defendant certified that she was inexperienced in financial matters, there was no "exchange" of financial information, and she relied on plaintiff's "representations," including that the parties could not afford attorneys. She asserted that her decision to accept half of plaintiff's share of the book value of each company was based on plaintiff's representations, which she was told were complete and candid, and the PSA itself, as it provided that it was based on "a full and fair disclosure" of the value of marital assets.
Defendant further alleged that plaintiff threatened to "`cancel' the divorce if [she] did not agree to the mediation." She also certified that plaintiff had admitted to her that he "forgot" to make the mediator aware of his interest in MSI's ESOP, which was "potentially worth millions of dollars."
By contrast, in his certification,[7] plaintiff denied that (1) he "withheld financial information from [defendant] or the mediator[,]" (2) he had any reason to think, at the time of the mediation, that MSI would sell for such a high price, (3) he pressured defendant into signing the PSA, or (4) he discouraged defendant from hiring an attorney. He identified a number of documents that he insisted were furnished to the mediator, and, thus, were presumably available for defendant's review, including the parties' joint tax returns, MSI and JSP financial statements, and an evaluation of the ESOP by A. James Parmiter dated October 7, 1998. Plaintiff emphasized that the Parmiter report contained a much higher valuation of MSI than the company's book value and asserted that this illustrated "the falsity of [defendant's] claim that she" or the mediator had no knowledge of the actual "size and value" of the marital estate.
Plaintiff also maintained that it was the mediator's idea to use book value as the basis to value MSI and JSP and suggested that defendant knowingly accepted a reduced distribution because "she was desirous of ending [the] marriage so she could pursue a new relationship with another man" whom she subsequently married. However, plaintiff offered no explanation for the fact that his interest in the ESOP was not distributed despite his production of the Parmiter report.
As a result of the certifications, the order requiring the evidentiary hearing was not inappropriate nor improperly entered. We note that, prior to the deposition of the mediator and review of his file, all of the pertinent documents in that file had been identified in the motion papers. In his certification, plaintiff identified the financial documents he allegedly supplied to the mediator, including the 1997 MSI and JSP financial statements and the Parmiter report. Thus, the production of the mediator's file did not result in the first judge's review of any documents she did not otherwise have or could not have reviewed in light of the certifications.[8]
*893 In any event, shortly after the mediation was completed, the PSA was executed, and the judgment of divorce was entered, it became clear that MSI was worth substantially more than the value attributed to it for purposes of the PSA. Judge Farber found that the plaintiff's portion of MSI should have been valued at $4,056,308, leaving plaintiff with a post-tax net of $3,073,997.28, which was more than $2,700,000 greater than the value in the PSA, where defendant's 50% share of plaintiff's equity interest had been valued at $153,569.[9] Further, little more than a year after the complaint was filed and within five months of the judgment, MSI was sold for approximately $16,000,000. We also note that the PSA further provided:
E. Notwithstanding any other provision hereinbelow to the contrary, as to any assets or liabilities of the parties with respect to which no such full disclosure has been made by either of the parties, then this Agreement shall not affect nor encompass the same and, if the parties cannot in the future agree with respect to distribution or apportionment of the same, after submitting the disputed issues to mediation, the Court shall, upon such discovery of assets or liabilities of either party, retain full jurisdiction to apportion such additional assets or liabilities appropriately. Specifically, this Agreement shall have no binding effect whatsoever upon any assets or liabilities not disclosed by either party hereto to the other and described herein.
Accordingly, we cannot disturb the first judge's order directing an evidentiary hearing, even though she should not have ordered discovery of the mediator or vacated the PSA, to the extent she did, before the hearing was conducted.

IV.
In his decision after the evidentiary hearing, Judge Farber concluded that it was "easy to arrive at th[e] finding" that the agreement was unconscionable and had to be set aside, since the distributions made to defendant for her interest in MSI and JSP in no way effectuated the parties' intent, expressed throughout the PSA, to divide their assets "on an exactly 50-50 basis."
While plaintiff is correct that some of defendant's original assertions in her certification supporting vacation of the PSA were not entirely accurate, it is clear that the record of the evidentiary hearing provides a basis to support Judge Farber's conclusion that the inaccuracies were insignificant. In any event, none of defendant's allegedly false statements were material to the need for an evidentiary hearing, and the record of that hearing justifies the final judgment which was entered.
Defendant asserts, however, that the evidentiary hearing and findings of unconscionability flowed from the first judge's findings following her review of the mediator's notes and testimony, not from the evidentiary hearing before Judge Farber. However, Judge Farber's determination that the PSA was unconscionable occurred after the evidentiary hearing, and there are no contentions of due process violations stemming from lack of notice that the trial would consider the claim of unconscionability or regarding the scope of the evidentiary hearing.
*894 At the outset of his December 27, 2004 decision, Judge Farber specifically noted that one of the issues before him was whether the PSA should be vacated as unconscionable. While noting that the first judge had reviewed the issue, Judge Farber observed that the ruling had been made "without the benefit of [a] hearing." Judge Farber stated that he had "now conducted the hearing and in the end analysis determines that the agreement was and is, in fact, unconscionable and should be set aside." Thus, Judge Farber made an independent unconscionability determination after the evidentiary hearing was conducted.
Judge Farber further explained that his failure to find fraud did not "negate the fact that the agreement was unconscionable." In this regard, Judge Farber found that the parties had intended to divide the marital estate on a 50-50 basis, as set forth in the PSA. According to the judge, "[s]ince . . . the correct values of those assets at the time of the [PSA] was so markedly different from the book value set forth [therein], the [PSA] was unconscionable and did not reflect what the parties, including plaintiff, intended." As such, Judge Farber was satisfied that the relevant provisions of the PSA had to be "vacated and recast."
In view of the foregoing, notwithstanding his originally stated intention to defer to the first judge's conclusion, we are satisfied that Judge Farber ultimately made his own findings of fact and conclusions of law on the unconscionability of the PSA. Moreover, neither Judge Farber's finding that the mediator was the one who suggested using book value for valuations of MSI and JSP nor his finding that plaintiff supplied the mediator with the Parmiter ESOP appraisal[10] was dispositive on the issue of the PSA's validity, as plaintiff contends. These facts, like many others, such as plaintiff's knowledge that MSI was obligated to pay its CFO James Smith $2,500,000 if the company was sold during pendency of Smith's employment contract, were factors relevant to the finding of unconscionability. Likewise, Judge Farber's findings that defendant acted unreasonably in failing to retain an attorney and a separate appraiser for the mediation did not necessarily preclude a finding that the PSA should be set aside. The record supports a finding of unconscionability based on the totality of circumstances. *895 See Lehr, supra, 382 N.J.Super. at 395-96, 889 A.2d 462 (scope of review). See also Cesare v. Cesare, 154 N.J. 394, 416, 713 A.2d 390 (1998) (need to defer to "the special expertise of the family court").

V.
On her cross-appeal, defendant contends that Judge Farber erred in failing to find plaintiff guilty of fraud. However, the issue of the alleged common law fraud is moot, since the PSA was vacated and defendant was awarded increased equitable distribution and legal fees and has not asserted a separate claim for money damages. Moreover, money damages cannot be awarded for equitable fraud. See Daibo v. Kirsch, 316 N.J.Super. 580, 588, 720 A.2d 994 (App.Div.1998).
Likewise, we reject plaintiff's contention that Judge Farber's determination on the fraud claim requires that we reverse his judgment based on a finding of unconscionability. Fraud and unconscionability have been recognized as two separate and independent bases for setting aside property settlement agreements. See Massar v. Massar, 279 N.J.Super. 89, 93, 652 A.2d 219 (App.Div.1995) ("Any marital agreement which is unconscionable or is the product of fraud or overreaching by a party with power to take advantage of a confidential relationship may be set aside"); accord Miller, supra, 160 N.J. at 419, 734 A.2d 752; Dworkin, supra, 217 N.J.Super. at 523, 526 A.2d 278. Furthermore, Webster's Dictionary defines "unconscionable" as "shockingly unfair or unjust[,]" making no mention of any finding of fraud. Merriam Webster's Collegiate Dictionary 1286 (10th ed.1993).
Moreover, it is uncontested that defendant was urged to accept her share in MSI based upon its book value. However, courts in New Jersey have long recognized that interests in closely-held corporations "cannot be realistically evaluated by a simplistic approach which is based solely on book value, which fails to deal with the realities of the good will concept, [and] which does not consider investment value of a business in terms of actual profit. . . ." Brown v. Brown, 348 N.J.Super. 466, 477, 792 A.2d 463 (App.Div.) (quoting Lavene v. Lavene, 148 N.J.Super. 267, 275, 372 A.2d 629 (App.Div.), certif. denied, 75 N.J. 28, 379 A.2d 259 (1977)), certif. denied, 174 N.J. 193, 803 A.2d 1164 (2002).
As the parties decided to engage in voluntary mediation in order to avoid the costs and expenses related to counsel and litigation, defendant's failure to retain counsel cannot be held against her, particularly where her husband had a contractual and moral obligation to be open and honest, and he suggested or believed that the family could be spared the expense of counsel. The mediation was intended to be a joint effort to amicably resolve the dissolution of the parties' marriage and to do so at minimal cost. In any event, we have detailed why the record supports Judge Farber's finding of unconscionability and believe that a property settlement agreement resulting from a voluntary mediation, like any privately negotiated PSA, may be reformed where there is unconscionability, fraud, or mistake and concealment. Indeed, there may be more reason to apply the principle in this context, since the mediator has no authority to compel disclosure and the process is dependent upon the candor and forthrightness of the parties.

VI.
Plaintiff contends that Judge Farber erred in his valuation of plaintiff's interest in MSI and JSP after considering the proofs at the evidentiary hearing and in dividing his interest in MSI equally between *896 the parties. In her cross-appeal, defendant contends that Judge Farber erred in failing to value MSI in accordance with its October 2000 sale price and JSP in accordance with its 2003 sales price. We reject the contentions of both parties, because the judge gave detailed reasons for his findings, both as to value and division of the assets, and the findings are supported by adequate credible evidence in the record. Rothman v. Rothman, 65 N.J. 219, 233, 320 A.2d 496 (1974); Wadlow v. Wadlow, 200 N.J.Super. 372, 377-82, 491 A.2d 757 (App.Div.1985); Borodinsky v. Borodinsky, 162 N.J.Super. 437, 443-44, 393 A.2d 583 (App.Div.1978). We find that none of the arguments advanced by either party affect the fairness or reasonableness of the ultimate distribution. R. 2:11-3(e)(1)(A). We comment briefly on two contentions only.
First, plaintiff contends that "[i]t was inequitable for the court to determine that defendant should receive 50% of the new and revised values of [MSI] and [the] ESOP plan by relying on the [vacated] Agreement which used book value in conjunction with a 50% distribution scheme." However, irrespective of the PSA, the fifty-fifty division was warranted in light of the length of the parties' marriage, the fact that defendant was there at the inception of the business, and the fact that defendant made a home for plaintiff and took care of the parties' two daughters, thereby enabling plaintiff to achieve success with his business. See N.J.S.A. 2A:34-23.1.
Second, in her cross-appeal, defendant renews her argument, originally made as part of her cross-motion for reconsideration of the December 27, 2004 order, that Judge Farber erred in valuing MSI as of August 23, 1999, the date the divorce complaint was filed, as opposed to October 16, 2000, the date MSI was sold to Somera. In rejecting this argument, Judge Farber commented as follows:
The parties entered into an agreement in June of 1999; the divorce complaint was filed two months later on August 23, 1999, and even the Judgment of Divorce predated the Somera sale. It is, in fact, the defendant that is seeking the windfall by asking the court to deviate from the standard of using the date of the divorce complaint. There is absolutely no proof, for example, that [plaintiff] planned the Somera sale before the parties started discussing divorce. In fact, there is no proof that he even had any contact with the Somera folks until after the Judgment of Divorce was signed. Simply arguing that the defendant would receive a greater share if a later evaluation date were used is not convincing. Defendant continually argues that by using the earlier evaluation date, the court, in effect, is rewarding the plaintiff for concealing assets. Her argument runs entirely counter to the decision of the [c]ourt on December 27, 2004, wherein the [c]ourt did not find that the plaintiff was responsible for the mediator's error in equitable distribution.
"[F]or purposes of determining what property will be eligible for distribution[,] the period of acquisition should be deemed to terminate the day the complaint is filed." Painter v. Painter, 65 N.J. 196, 218, 320 A.2d 484 (1974). Where there has been fluctuation in the value of a marital asset between the date the divorce complaint was filed and the date of distribution, the driving force behind that fluctuation must be determined so that proper distribution of the asset may be accomplished. Scavone v. Scavone, 243 N.J.Super. 134, 136-37, 578 A.2d 1230 (App.Div. 1990). Where the value of a particular marital asset has increased due to the diligence and industry of the party in possession *897 of that asset, independent of market forces, the increase will normally accrue to that party alone. Id. at 137, 578 A.2d 1230. Where, however, the enhanced value is attributable to market factors or inflation, the increase will generally be divided between both parties. Ibid. But where, as here, parties have entered into a formal PSA and physically separated, the date of the written agreement should be treated as the date of termination of the marriage for the purpose of equitable distribution, so long as the ultimate distribution is in fact equitable. See Smith v. Smith, 72 N.J. 350, 360-62, 371 A.2d 1 (1977). On this record, there was no basis for finding a date later than that of the complaint's filing to control; therefore, we agree with Judge Farber on the valuation date.

VII.
Plaintiff contends that Judge Farber erred in ordering him to pay "100%" of defendant's counsel and expert fees "up to the motion for reconsideration."[11] We disagree.
The award of counsel fees and costs in a matrimonial action rests in the discretion of the trial court. R. 5:3-5(c); Heinl v. Heinl, 287 N.J.Super. 337, 349, 671 A.2d 147 (App.Div.1996); Guglielmo v. Guglielmo, 253 N.J.Super. 531, 544-45, 602 A.2d 741 (App.Div.1992). In deciding whether to make such an award and to determining the award's amount, the court should consider:
(1) the financial circumstances of the parties; (2) the ability of the parties to pay their own fees or to contribute to the fees of the other party; (3) the reasonableness and good faith of the positions advanced by the parties; (4) the extent of the fees incurred by both parties; (5) any fees previously awarded; (6) the amount of fees previously paid to counsel by each party; (7) the results obtained; (8) the degree to which fees were incurred to enforce existing orders or to compel discovery; and (9) any other factor bearing on the fairness of an award.
[R. 5:3-5(c).]
In his April 12, 2005 decision, Judge Farber reconsidered his original denial of defendant's request for an award of counsel fees. The judge found that, as a result of the ultimate judgment, both parties were "able to pay their own fees and costs." However, the judge was persuaded that plaintiff had not acted in good faith in connection with the litigation, and that factor "weigh[ed] heavily" against him. In *898 Judge Farber's view, plaintiff could have "voluntarily come forward and offered a more fair distribution without the necessity of the expensive litigation he pursued" that caused the defendant to incur substantial unnecessary expenses. The judge found plaintiff's "posture" "especially egregious in light of everyone's knowledge of the defendant's existing medical problems during much of the pendency of the case."
As such, after further finding that defendant had largely prevailed in the litigation, Judge Farber ruled that plaintiff would be required "to pay a portion of defendant's attorneys' fees[.]" The judge directed defendant to resubmit her affidavit of services and offered plaintiff a period of time in which to respond. Plaintiff subsequently submitted a certification in opposition to defendant's affidavit, wherein he represented that he had incurred counsel fees and disbursements totaling $272,143.70. He stated that he had also spent $53,633.87 in expert fees in connection with this litigation.
As previously noted, Judge Farber ultimately awarded defendant $140,955.17, "representing $91,772.50 in attorneys' fees and $49,182.67 in expert fees" incurred through the time the proofs were completed and the December 2004 opinion was rendered. As also noted, consistent with charging plaintiff only for the unnecessary litigation for which he was responsible, the judge declined to award defendant the additional $25,252.80 in fees she had incurred thereafter.[12]
We find no abuse of discretion in light of the reasons Judge Farber gave. While plaintiff argues that the fees claimed by defendant were not demonstrated to be reasonable, and the judge made no comment on that contention, we note that defense counsel submitted a detailed certification in support of his fee award, and plaintiff's fees appear to have exceeded those of defendant. Moreover, we find no basis for disturbing the counsel fee award, because plaintiff did not suggest the use of book value and was found not to have committed a fraud. As we have developed, the fact that the PSA was found to be unconscionable and that plaintiff continued to assert otherwise presents a different issue.
Finally, plaintiff argues that Judge Farber erred in awarding defendant expert fees without critically examining the bills, correlating them to the results obtained, and taking into account defendant's ability to pay. However, the award here was irrespective of any bad faith, and the bottom line with respect to this contention, indeed the critical fact underlining so much of this litigation, is that MSI was worth almost $15,000,000 more than the equity value set forth in the PSA.

VIII.
In essence, we reject the contentions of both parties. We are satisfied, under our scope of review, that the result in this case is fair and just under the totality of circumstances. The judgment is in all respects affirmed. Considering the number of issues raised by each party, the relative amount of time that had to be devoted to the appeal, the ultimate disposition of the marital estate, and the good faith of both parties with respect to the issues they raised on appeal, no counsel fees or costs will be awarded for the appeal.
Affirmed.
NOTES
[1] $1,538,978.37 represented half of plaintiff's interest in MSI Communications, Inc., $142,781.98 represented half of plaintiff's interest in Jersey State Properties, and $24,750.84 represented half of his shares of the MSI employee stock option plan. In the judge's statement of reasons of the same day, the aggregate amount of defendant's award was $1,704,493.94. Neither party addresses the basis for the difference nor asserts that it is material; because the difference in the overall sum is relatively small, it does not affect the result or warrant further attention.
[2] No issue is addressed regarding the October 18, 2005 post-judgment order, which was entered while the appeal was pending.
[3] Pursuant to her decision of December 22, 2000, the first judge entered a protective order as to the mediator's file on June 8, 2001 and then deposed the mediator on June 18, 2001.
[4] By agreement dated October 16, 2000, the sale of MSI stock to Somera Communications, Inc. was completed for a total acquisition price of about $16,000,000. On September 5, 2003, JSP sold the building and land it owned for $1,400,000.
[5] In fairness to the first judge, we note that her order requiring the discovery was entered before N.J.S.A. 2A:23C-1 to13, the Uniform Mediation Act, was enacted and before Williams and Lehr were decided.
[6] Plaintiff received approximately $3,700,000 for his interest in MSI. According to his 2000 tax return, in the year of the divorce, he earned $3,868,786, including $154,832 in salary. He also obtained an employment agreement and $1,400,000 in stock in 2001 and $125,000 in 2002 through the MSI sale agreement. As part of the sale of MSI, the building owned by JSP was leased to the purchaser, but the lease was breached for a penalty of $178,500, and the building was sold in 2003 for $1,400,000. We refer to these figures not because they are conclusive as to equitable distribution, given other facts and factors present, but to explain why an evidentiary hearing was warranted.
[7] There is no certification on our copy of the document called "Certification of Vincent Adessa."
[8] The mediator denied receiving the Parmiter report, but the first judge did not rely upon this testimony, finding it immaterial in making her ruling regarding the unconscionability of the PSA. In her view, the more crucial point was that plaintiff had not "averred that he gave the Parmiter appraisal to [defendant] and she" denied any knowledge of the report. According to the judge, "the husband's knowledge and the wife's ignorance [were] pivotal" at the time the PSA was negotiated. Thus, it can be said that the mediator's deposition and the court's review of his file ultimately had no material impact on the first judge's ruling.
[9] The PSA required plaintiff to pay defendant one-half of his "47.8 percent share of the $642,928 total shareholders' equity interest" in MSI.
[10] In his written opinion of December 27, 2004, Judge Farber found:

that it was [the mediator] who suggested book value as the value to be utilized in determining distribution. It may be that plaintiff sat passively by, knowing that book value did not reflect the true fair value of the business. It may be that he hoped that defendant would rely upon [the mediator's] judgment and that she would also expect him to be forthright. . . . It is clear that [plaintiff] provided the mediator with financial statements for MSI and JSP as of December 31, 1997, as well as a marked up 1997 statement projecting 1998 information. . . . The latter statement was not substantially different from the 1998 Financial Statement when officially prepared. . . . Although [the mediator] testified before [the first judge] that he had not received the ESOP evaluation performed by AJ Parmiter and Sons in 1998, that seems highly unlikely in light of the fact that the [PSA] prepared by [the mediator] . . . provides in Section 4.05 that plaintiff will pay to the defendant "one half of the value of [plaintiff's] 47.8% share" of the stockholders equity interest. It is simply too coincidental that [the mediator] arrived at a 47.8% figure without having the benefit of the Parmiter report; the 47.8% figure appears in the Parmiter report, and it is the only other place it does appear. There is certainly no indication of an independent analysis by [the mediator] to arrive at that figure. The [c]ourt is reasonably certain that he did, in fact, have the ESOP available to him.
The finding that plaintiff supplied the Parmiter report was also significant with respect to the finding that no fraud occurred.
[11] In his order of December 27, 2004, Judge Farber denied counsel fees without reasons. However, in its statement of reasons on the cross motions for reconsideration filed April 12, 2005, the court "readdress[ed] the issue" and concluded that counsel fees were warranted under R. 5:3-5(c) "primarily" because plaintiff "clearly should not have pressed his position to strictly enforce the [PSA], especially after [the first judge's] 2001 decision clearly enunciated that the agreement would not be upheld as unconscionable." Judge Farber invited an affidavit of services and response. The application covered the period through the trial into April 2004, and totaled $140,955.17 in counsel and expert fees. By order dated June 1, 2005, Judge Farber awarded the $140,955.17, "representing $91,772.50 in attorneys' fees and $49,182.62 [in] experts fees[.]" The order of June 1, 2005 also provided that a subsequent application for fees, filed after the April 2005 decision on the cross-motions for reconsideration, for the period after April 7, 2004, was denied because the "fees incurred subsequent to the December 12, 2004 order" were "predominantly . . . created by errors" in the opinion resulting in that order and because "most of defendant's cross-motion [was] rejected by the Court." It appears, therefore, that fees were awarded for the period through the trial but not for the subsequent period following the initial decision of December 2004.
[12] See footnote 11, supra.