**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2130-16T3

SHAI AVRAMOVICH,

     Plaintiff-Respondent,

v.

LISA GARSON,

     Defendant-Appellant.

_____

        Argued November 8, 2018 – Decided December 11, 2018

        Before Judges Koblitz, Ostrer and Mayer.

        On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FM-09-2293-11.

        Lisa Garson, appellant, argued the cause pro se.

        William Rodriguez argued the cause for respondent (Rodriguez Kim Law Group, LLC, attorneys; Jaclyn Saltzman, on the brief).

PER CURIAM

Defendant Lisa Garson appeals from the November 16, 2016 denial, without a plenary hearing, of her application to enforce and amend her matrimonial settlement agreement (MSA). Neither party was represented by counsel when they signed the MSA or later when they were divorced. Plaintiff Shai Avramovich and defendant were married in 1999, separated in 2009 and had no children. Plaintiff filed a divorce complaint in 2011. The parties executed their MSA on May 2, 2011, ten months prior to the entry of the final judgment of divorce (JOD) on March 2, 2012. We affirm most of the decisions of the trial judge, reversing only the provision regarding the division of the proceeds of a marital property, 50 North Walnut Street, that may have been sold by plaintiff without defendant's knowledge between the date of the MSA and the entry of the JOD. We remand for a plenary hearing.

## I. The MSA

With regard to the marital home, the MSA states:

> [Plaintiff] owns the following real property as their family residence, located at [] Erie Street, Jersey City, NJ –07302.

> [Plaintiff] and [defendant] agree that [defendant] shall continue to reside at the above mentioned family residence for a period of seven (7) months following the award of Final Judgment for Divorce.

2

[Plaintiff] shall assist [defendant] in procuring a new residence after the 7 month period. If [defendant] does not procure a suitable place to live within seven (7) months, then [defendant] shall remain living at [] Erie Street, Jersey City, NJ 07302 until [defendant] finds a new residence. [Defendant] shall provide proof of search for new place to live to [plaintiff] on a monthly basis.

[Plaintiff] has the right to charge [defendant] rent in an amount less than one thousand five hundred one ($1,501.00) dollars usd.

The MSA also states:

[Plaintiff] shall have the following rights of title and ownership in the family residence: 100% Ownership and Title to property.

[Defendant] shall have the following rights of title and ownership in the family residence: A financial settlement which shall be secured by equity ownership and title to property in the event of default by [plaintiff] of financial obligations per this settlement agreement.

[Defendant] shall file a UCC-1 lien against the property located at [] Erie Street, Jersey City, NJ 07302 USA in an amount equal to sixty seven thousand ($67,000.00) dollars usd. This amount will be amended (reduced) per [plaintiff's] payments according to and versus the settlement instructions.

Plaintiff was responsible for the mortgage, maintenance and related expenses associated with the Erie Street residence. For the seven months defendant resided at the residence, she was not responsible for any expenses

3

related to the home.  As for other real estate, the MSA states the following:

"[Plaintiff] and [defendant] jointly own the following other real estate to be divided as follows:  50 North Walnut Street Waterbury, Connecticut 06704." There is no explanation of how this property should be divided.

The MSA, as amended in court upon defendant's request, awards defendant the following equitable distribution:

> [Plaintiff] shall pay [defendant equitable distribution] in the sum of Ninety-Two Thousand Dollar USD ($92,000.00), to be disbursed Twenty-Five Thousand ($25,000.00) in 2011, Twenty-Five Thousand ($25,000.00) in 2012, Twenty-One Thousand ($21,000.00) in 2013, and Twenty-One Thousand ($21,000.00) in 2014.  Each disbursement will be a onetime full disbursement to [defendant] paid by [plaintiff] directly to [defendant]'s designated account. . . . The disbursements shall begin on the day of FINAL JUDGMENT AWARD for DIVORCE.  [Plaintiff] agrees to place first disbursement (2011) in ESCROW to be delivered to [defendant] when DIVORCE is final. However, [plaintiff] and [defendant] agree that [defendant] may withdraw or drawdown against the Escrow in an event that coincides with instructions memorialized with the ESCROW ATTORNEY. . . . On the day of Final DIVORCE AWARD, will signal the day of each subsequent disbursement to [defendant] (example:  Final Divorce award June 1, 2011, disbursement shall be made to [defendant] no later than June 5, 2011 and each subsequent disbursement shall occur the following year on June 5 until the settlement has exhausted.  In the event of default by [plaintiff], [defendant] is entitled to a lien on [plaintiff's] property now listed or any property available at the time of

default in an amount equal to the balance owed against the settlement agreement or five (5%) ownership and equity in any existing property whichever is higher at the time of default. [Plaintiff] understands he may be ordered by the Court to sell property in order to meet settlement agreement obligations to [defendant].

[Plaintiff] has agreed to provide support to [defendant] with reasonable expenses until divorce is final and [defendant] agrees to accept spousal support as described above specifically leaving first escrow disbursement intact and untouched ($25,000) until Divorce is final unless [defendant] demonstrates an immediate need which shall be determined by the escrow Attorney outlined above.

[Defendant] shall file UCC-1 lien against property at time the Court awards a final JUDGMENT OF DIVORCE.

The MSA also contains a default provision:

In the event of default, [plaintiff] agrees to pay [defendant] three (3%) percent default fee which shall accrue monthly and compound until default if [sic] cured. If default is not cured in a timely manner which shall be observed as sixty (60) days, then accrued interest shall automatically attach as equity interest and liens on [plaintiff's] any existing property.

Both parties acknowledged in the MSA that they "entered into this agreement in good faith, without any duress or undue influence." In addition, they both acknowledged that they understood their "right to seek independent

counsel regarding [the MSA], and each . . . had the opportunity to seek independent counsel prior to signing [the MSA]."

At the divorce hearing, the parties confirmed they were both waiving alimony, and defendant said she would "be able to maintain a lifestyle that is reasonably comparable to that which [she] enjoyed during the course of [her] marriage." Both parties stated they read and understood the contents of the MSA, did not have any questions regarding any of the its provisions, believed it was fair and reasonable, and were not "forced, pressured or coerced" into signing it.

Defendant asked if the MSA could be revised to say "equitable distribution" instead of "spousal support," for tax purposes. She stated that the $92,000 payment was "considered against the investment in the property. I mean, like he's buying me out of my share of the property. That's kind of pretty much how we drafted this. . . . That's the only thing we were considering." Plaintiff agreed that the $92,000 payment was considered equitable distribution. Defendant acknowledged that plaintiff had "already given some payments to [her]." The MSA was revised so that the $92,000 was deemed equitable distribution. Though she acknowledged that the MSA should be more thorough, defendant stated that she "thought . . . it was fair enough." Both parties stated

on the record that they did not wish to consult an attorney after the judge warned them that an attorney could review the agreement and give advice concerning its enforceability.

## II. Order to Show Cause

Defendant filed an order to show cause in July 2015, approximately three-and-one-half years after the JOD was entered. Defendant alleged that plaintiff had breached the MSA because he was "in arrears of an excess of $50,000 plus accrued interest, and [had her] home under a sales contract estimated at 1.5 to 2.2 million dollars with the intent to eject her without fulfillment of the settlement." Defendant calculated plaintiff owed her $86,823.96 on a spreadsheet. The spreadsheet indicated that of the $92,000 settlement amount, plaintiff paid defendant $41,910, but owed her $50,090 plus $36,733.96 in accrued interest. The $50,090 represented "[r]ents [w]ithheld in [a]dvance." Defendant also submitted a 2009 Schedule K-1 indicating that she owned a 50% partnership share in [] Erie Street, LLC. Therefore, defendant sought an "immediate lien" of $86,900 against [] Erie Street.

Defendant stated that she still lived at the Erie Street residence because of plaintiff's non-payment under the MSA. Defendant further stated that she did not have a lease agreement with plaintiff, so she was not protected under tenancy

A-2130-16T3

laws.  In addition, defendant was "not employed and [had no] income or assets other than food stamps and general assistance."  Defendant claimed she could not move out of the Erie Street residence for financial reasons.

Defendant also stated that "per email" on June 24, 2015, she was informed that "an inspection would occur over the course of (2) days and that her locks would be changed."  Defendant alleged that the following morning plaintiff's handyman entered defendant's apartment "without a key prior to her arrival and removed her property for trash disposal."  Defendant also claimed that though she "was the property manager and business bookkeeper/administrator during the marriage," plaintiff hid money offshore.  In addition, plaintiff sold "the Connecticut property listed as a shared asset . . . in 2011 . . . ."  Defendant "did not receive any proceeds from the sold asset."  Defendant concluded:  "The settlement was by no means equitable and signed under extreme duress. [Defendant] had no legal representation at any time.  For those reasons, it is imperative the Court attach a lien in the amount above in the defendant's name."

The judge denied defendant's order to show cause, converted the matter to a motion, and scheduled a hearing.  The order stated:

> Plaintiff's certification in opposition to defendant's order to show cause claims that he has satisfied any and all monetary obligations owed to the defendant.

A-2130-16T3

Plaintiff also certifies that the subject property is not under a sales contract.

Defendant fails to prove that immediate and irreparable damage will probably result before a full hearing as the property at issue is not under an impending sales contract nor is defendant subject to an ejectment action.

At the hearing on September 22, 2015, defendant, who appeared pro se, argued that because plaintiff withheld "a year's worth of rent in advance," he was "holding [her] hostage in the house." Defendant then stated:

> Also in this agreement it cites that we owned a property, [50] North Walnut, and that there was nothing stipulated as to the disposal thereof. And he disposed of it prior to the finalization. And I saw no funds from that at all. And I was not aware that he was selling it.

Plaintiff, who was represented by counsel, confirmed that defendant had been living at the Erie Street residence rent-free since 2011, and under the MSA, plaintiff would actually be entitled to rent money from defendant. Plaintiff's counsel stated further:

> To assert that he has held her hostage there by not allowing her to move is ludicrous. . . .
>
> If he was going to give her the money that would be tantamount to the rent credits that she was getting he wanted a lease because you can't have your cake and eat it too. You can't live rent free and collect the money that the rent is being credited to you for. He asked for that on several occasions. There was no responses.

9

. . . .

> So we assert that her figures as a whole are wrong because her initial amounts are wrong. And so she can't meet her proofs. Mr. Avramovich has allowed her to live there rent free since 2011. He credited her more months than he technically should have given her because he was trying to be amicable about it.
>
> They signed an agreement that on its face -- I'm still trying to figure out how to enforce because they were two parties who didn't have an attorney. They had a friend who graduated from law school drew up this agreement. They hoped that it would be . . . an amicable resolution.

Defendant also confirmed she never paid plaintiff rent after the seven-month period despite the provision in the MSA.

Plaintiff's counsel also pointed out that defendant did not file a UCC-1 lien against the property as required by the MSA. Plaintiff's counsel also argued defendant's claim that plaintiff sold a jointly-owned property at 50 North Walnut Street in Connecticut was not "relevant to the motion today."

The judge found that under the MSA, defendant was only allowed to reside at the Erie Street residence for seven months after the judgment of divorce on March 2, 2012, yet defendant continued to live at that address rent free. Under the MSA, plaintiff could charge her $1500 in rent per month from November 2012 to October 2015 for a total of $54,000. Therefore, even if

plaintiff owed $51,000, as defendant alleged, after "[c]rediting the rent amounts to [p]laintiff," plaintiff overpaid defendant by $3000. In addition, the judge found that under the MSA, defendant "had the opportunity to file a UCC-1 lien against the property," but has not shown "whether or not this lien has been filed." The judge found that defendant "failed to show by a preponderance of the evidence" that plaintiff still owed her money; therefore, her motion was denied in its entirety. The judge did not address the alleged sale of the 50 North Walnut Street property.

### III. The Motion to Enforce and Amend the MSA

A year later, in September 2016, defendant, through counsel, moved to enforce and amend the MSA, primarily arguing that "numerous joint properties were not identified in the MSA." Defendant's apparent impetus for filing the motion stemmed from learning, in August of 2013, that defendant sold 50 North Walnut Street in December 2011,[1] after the MSA was signed and before the divorce was finalized. Defendant presented four arguments. Defendant claimed that plaintiff was required, under the MSA, to give defendant $28,250, half of the $58,500 proceeds from the sale of 50 North Walnut Street. Defendant

---

[1] Defendant offers the result of a Waterbury, Connecticut online search engine that includes a December 21, 2011 sale of "50-52 NORTH WALNUT ST."

A-2130-16T3

acknowledged that the MSA is silent as to how, if at all, 50 North Walnut Street would be divided. Defendant also argued plaintiff committed a fraud upon the court by not reporting the sale; as a result, the divorce proceedings should be reopened.

In addition, defendant argued that contract law governed the MSA, so the court should rely on extrinsic evidence to supply any missing terms, or to interpret ambiguous terms, regarding the parties' intent to divide 50 North Walnut Street.

Finally, defendant claimed the MSA was invalid because "plaintiff induced sufficient moral compulsion to overcome the will of defendant," thus rendering the MSA "unconscionable" and in need of reform. "[B]ased on the duress exerted by [p]laintiff," and as a result of plaintiff not providing defendant "her share of the equity from the sale" of 50 North Walnut Street, defendant argued that the MSA was invalid, and the judge "must reopen the matter" to at least determine "the enforceability of the [MSA] and the financial balance between the parties . . . ." Finally, defendant argued that a plenary hearing must be held to determine the ambiguous terms of the MSA and the parties' intent regarding any distribution of proceeds from the sale of 50 North Walnut Street.

On November 16, 2016, the motion judge denied defendant's motion in its entirety. Although the denial order was designated "without prejudice," both parties accept this as a final order. The motion judge first addressed the issue of the Connecticut property sale. The motion judge stated:

> Defendant holds the position that by not disclosing the sale prior to the final judgment of divorce, the MSA was procured by fraud and therefore the MSA should be reformed due to its unconscionability. . . .
>
> New Jersey Court Rule 4:50-2 requires that the motion to relieve a party from a final judgment due to fraud be filed not more than one year after the judgment, order or proceeding was entered or taken. In this case, [defendant] waited almost three years to bring the matter of fraud to the court. [Defendant] had prior opportunities to dispute the allocation of the 50 North Walnut Street Property but failed to do so.

The motion judge next addressed defendant's claim that, "because she did not have independent counsel," the MSA was "one-sided" and unjust, and "she was under great duress" as a result of plaintiff's coercion. Neither party had counsel at the divorce proceeding. The motion judge noted that "defendant was able to competently ask the court to modify the MSA . . . to categorize the funds she would be receiving as equitable distribution as opposed to alimony for tax purposes." In addition, when defendant was asked about the content of the MSA, she replied, "I thought it was fair enough."

13

The motion judge concluded:

> [D]efendant had the opportunity to question the MSA regarding distribution of the 50 North Walnut Property but failed to do so either at the final hearing or in previous motions. Instead the defendant conceded there were no properties in dispute and that the terms of the agreement were fair and equitable. The defendant has failed to prove that she was under duress when entering the agreement, that the agreement was procured as a result of fraud, or that the MSA was unconscionable.

## IV. Legal Analysis

We afford deference to the factual findings of the family court. Thieme v. Aucoin-Thieme, 227 N.J. 269, 282 (2016). This is due to "the family courts' special jurisdiction and expertise in family matters . . . ." Cesare v. Cesare, 154 N.J. 394, 413 (1998). We are bound by the findings of the family court when such findings are supported by "adequate, substantial, [and] credible evidence." Id. at 411-12.

A court will not uphold a settlement agreement if the moving party demonstrates "fraud or other compelling circumstances." Nolan v. Lee Ho, 120 N.J. 465, 472 (1990) (quoting Pascarella v. Bruck, 190 N.J. Super. 118, 125 (App Div. 1983)); see also Quinn v. Quinn, 225 N.J. 34, 47 (2016) (quoting Miller v. Miller, 160 N.J. 408, 419 (1999)) (noting that "[a] narrow exception to the general rule of enforcing settlement agreements as the parties intended is the

need to reform a settlement agreement due to 'unconscionability, fraud, or overreaching in the negotiations of the settlement'").  Without any evidence of fraud or coercion, a court is obligated to enforce the terms of the settlement agreement when entered into by "fully informed" parties.  Avelino-Catabran v. Catabran, 445 N.J. Super. 574, 590 (App. Div. 2016) (quoting Quinn, 225 N.J. at 55).

The motion judge applied settled law to reject defendant's claims of fraud.  However, defendant's claim that plaintiff did not share the proceeds after surreptitiously selling 50 North Walnut Street, after the MSA was signed but before the divorce was finalized, is a contract claim, with a six-year statute of limitations.  N.J.S.A. 2A:14-1.  We therefore remand for the motion judge to hold a plenary hearing to interpret the intent of the parties, and determine whether the fifty percent split of the proceeds sought by defendant is appropriate.

Her remaining arguments, which were somewhat difficult to follow, are without sufficient merit to require further discussion.  R. 2:11-3(e)(1)(E).  The remand judge may, however, expand the nature of the plenary hearing as the judge sees fit, depending on the evidence that is developed.  We see no reason to remand to a different judge, as urged by defendant.

Affirmed in part and reversed and remanded in part for further proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2130-16T3