**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0973-20

MICHAEL GIUNTA,

    Plaintiff-Appellant,

v.

SHANNON FAHEY,

    Defendant-Respondent.

_____

Submitted November 15, 2021 – Decided December 6, 2021

Before Judges Sabatino and Rothstadt.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Somerset County, Docket No. FM-18-0851-19.

Gomperts Penza McDermott & Von Ellen, LLC attorneys for appellant (Marissa Lepore Hovanec, of counsel and on the briefs).

Thomas J. Hurley, attorney for respondent.

PER CURIAM

After a three-day divorce trial, the Family Part entered a final judgment that, among other things, ordered plaintiff Michael Giunta ("the husband") to pay $2,500 monthly ($30,000 per year) in limited duration alimony to defendant Shannon Fahey ("the wife") for a period of twelve years. The court set the alimony amount after imputing earnings to the husband, a financial executive who had very recently been laid off, but declining to impute additional earnings to the wife above her existing salary. The court also ordered the husband to obtain a life insurance policy with a death benefit to secure his alimony obligation. The husband moved for reconsideration, which the court denied, with the exception of ordering a reduction of the life insurance policy coverage amount.

On appeal, the husband seeks reversal of the $30,000 annual alimony award and a further reduction the face value of the life insurance policy. He argues he is not voluntarily unemployed, and it was unfair for the court to impute the earnings level that it ascribed to him. He further argues the court should have adopted his vocational expert's opinion that a higher annual salary should have been imputed to the wife. He does not appeal other aspects of the judgment. The wife opposes the alimony reduction, but she is amenable to an adjustment of the life insurance amount. She has not cross-appealed.

A-0973-20

For the reasons that follow, we affirm the court's alimony determination, without prejudice to the husband's ability to move for a future modification as the parties' employment circumstances may evolve. We remand in part solely concerning the life insurance amount.

I.

Since the issues before us are limited to the alimony and life insurance awards, we need not detail the many facets of the parties' marriage that emerged at trial having little or no relevance to those financial issues. The following overview will suffice for our purposes.

The parties married in January 2004, which signifies their marriage was a fairly lengthy one spanning slightly over sixteen years. The parties are in their early fifties. They have two children, who are now ages fifteen and sixteen. The child-related issues were resolved in mediation, with an agreement designating the wife as the children's primary residential custodian and dividing parenting time on a roughly equal basis.

The equitable distribution issues, including the sale of the marital home, were decided by the trial court and have not been appealed. The court found, and it is not disputed on appeal, that the parties enjoyed a marital lifestyle beyond their financial means.

A-0973-20

The husband has a B.A. degree in accounting and finance from St. Joseph's University. The wife has a B.A. degree in Business Administration from the University of Miami. Throughout their marriage until he was laid off in 2020, the husband worked in the financial services industry. The wife initially worked for a pharmaceutical company, but then left the workforce to raise the children. She eventually returned to work as a receptionist in September 2019 after the divorce complaint in this case was filed.

Three witnesses testified at trial: the two parties and a vocational consultant, Lynn Levine, Ph.D., who testified as an expert for the husband about the wife's earnings capacity. The first day of trial in March 2020 took place in a courtroom, but the second and third days were conducted remotely in June 2020 due to the COVID-19 health restrictions.

The husband testified that he worked for many years in the financial industry, eventually attaining the position of a Global Group Comptroller for the international firm of Bain Capital. He worked for a company named Kantar from 2011, which was acquired by Bain it (and renamed "Lightspeed Research") in December 2019.

In 2019 the husband earned $195,000 in salary plus a $5,000 allowance, and he had earned roughly commensurate amounts in preceding years. The

A-0973-20

husband contended that he had been "vastly overpaid" as the result of Kantar—despite it being based in New Jersey—matching his previous salary when we worked at BlackRock in New York City.

In late February 2020—less than a month before the start of this divorce trial—the husband was informed by Bain that he was being terminated. He learned he was bring laid off, along with approximately a hundred other employees, as part of a company-wide reorganization. From June 1, 2020, the husband received from Bain nine weeks of severance pay.

The husband recounted that, after being notified he was being let go, he "immediately took steps" to look for employment, including updating his resume and LinkedIn account, and contacting acquaintances at a recruiting firm and former employers. He started having conversations with contacts, including several recruiting firms, in the first days of March 2020, within days of being notified of his termination. The husband also stated that, by June 15, 2020, he had sent out over eighty job applications through LinkedIn.

As of the time of the husband's June 2020 trial testimony, none of those applications and efforts had led to job interviews. The husband explained that virtually all the job openings for which he would otherwise be qualified include "MBA or CPA preferred" and that he possesses neither credential. He testified

A-0973-20

the annual salaries for the jobs he is qualified for, and to which he had been actively applying, range between $125,000 and $140,000 per year.

The husband believed that in the months before the COVID-19 pandemic, he might have been able to find a job "within a few weeks" given his strong resume and many contacts. He perceives the pandemic had caused firms in his field to cease hiring for the time being and had cast uncertainty over his prospects. Based on his unsuccessful job search thus far, the husband anticipated "his pay [level at Bain of $200,000] is going to go down probably around $50,000."

The husband was not making support payments to the wife, pendente lite, since his termination. Due to COVID-19, his mortgage companies had allowed him to defer monthly payments in light of his unemployment, and he had deferred these payments by six months as of June 2020. He stated he instead has been using available funds to pay down the family's debts.

In her own testimony, the wife recounted that after her college graduation in 1992 through 2005, she worked in various sales roles at Holman Enterprises, the Carter-Wallace Company, and Janssen Pharmaceuticals. She received a number of promotions and salary raises over that period. She earned approximately $65,000 as a financial analyst at Janssen the year before she left

A-0973-20

the workforce to become a stay-at-home parent in 2005. She resumed working in 2019, earning $50,000 annually as a receptionist for a local firm. The wife expressed relief at being able to find a receptionist job at the salary she is earning, given her extended time out of the workforce.

Dr. Levine was presented by the husband as an "employability and vocational expert." The wife did not contest her qualifications as an expert witness. The husband retained Dr. Levine to opine on the wife's earning capacity in light of her employment history, education, and current work as a receptionist. Dr. Levine did not opine about the husband's own earning capacity, nor did the wife present a competing expert witness.

After meeting several times with the wife and reviewing her employment history, Dr. Levine opined that "[u]pon completion of an upgrading in skills, upon obtaining that additional certification that would overlay and update her Bachelor's Degree, [the wife] would enter the role of compensation and benefits analyst or representative at an entry salary in the low to upper $60,000 range."

The expert added that such training programs would typically cost "anywhere from the low 2, $3,000 range, [and] … for an extensive program it could be as much as 8 to $10,000[.]" Dr. Levine declined to opine that the wife was "underemployed," asserting instead that "[t]he question for [her] evaluation

7

is what is [the wife's] employability and … career options, and that was the question [she] was responding in [her expert] report."

Commenting on the wife's current employment, Dr. Levine stated that "$50,000 a year … [is] a great salary for a receptionist in [the wife's] geographic area" based on "New Jersey Department of Labor 2018 data." Although not deeming the wife "underemployed," the expert acknowledged she "could be doing better when looking at her educational background."

In its oral decision, the trial court granted the parties a dual judgment of divorce on the grounds of irreconcilable differences. With respect to alimony, the court analyzed the fourteen factors to be weighed when considering the allocation of spousal support under N.J.S.A. 2A:34-23, applying his findings to each.[1]

Addressing the "actual need and ability of the parties to pay" under N.J.S.A. 2A:34-23(b)(1), the court acknowledged the husband's recent job loss, and the absence of any expert testimony about to his ability to earn.[2] The court noted the husband's detailed summary of his employment search efforts, as well

---

[1]  Rather than detail the judge's findings on each of the fourteen factors, we discuss only the findings most relevant to the three central issues at stake.

[2]  Indeed, the trial court suggested the husband work with Dr. Levine to aid his search for employment, which the husband agreed was a sound idea.

A-0973-20

as his contention that personal connections with his former employer in New York led to his being "substantially overpaid" while earning approximately $200,000 per year. The court found the husband's testimony credible, and specifically regarded as "believable" the husband's doubts as to whether he would be able to earn $200,000 per year in a new role.

Taking this testimony and the circumstances into account, the judge imputed what he termed a "fair and reasonable" lower sum of $120,000 in annual earnings to the husband, in light of "his work history." The court noted that whether or not the husband was employed, "neither of the parties would have the ability to maintain the standard of living that they enjoyed during the marriage." However, considering the wife's present salary of $50,000, "there is clearly a need for [her to receive] alimony."

With respect to the wife's earnings, the court deemed Dr. Levine's expert testimony "credible," and found "she did a good job of going through the facts . . . and explaining why she believes [the wife] was capable of earning more[,]" but stopped short of imputing additional income to the wife, beyond her actual current salary of $50,000 per year.[3] The court noted Dr. Levine's opinion that

---

[3] Because the trial court's findings concerning the wife's earning capacity hinged largely upon the husband's own expert, we need not address here the husband's arguments concerning the wife's credibility.

A-0973-20

the wife could be earning in the low- to mid-$60,000 per year range was contingent on approximately "eighteen months of additional training," and thus implied it would be unfair to consider her voluntarily underemployed.

Regarding the parties' ages and physical and emotional health under N.J.S.A. 2A:34-23(b)(3), the court found no age or health concerns prohibitive of the parties respectively "maximizing his or her income."

Turning to the "standard of living established in the marriage" under N.J.S.A. 2A:34-23(b)(4), the court reiterated that while their marital lifestyle is unsustainable whether either party is unemployed or not, that "the reduced lifestyle should be shared by both the parties."

Under N.J.S.A. 2A:34-23(b)(5), which considers the parties' "earning capacity" and educational level—a key provision with respect to imputing income—the court stated it had covered that factor in deciding to impute $120,000 to the husband. The court reiterated that because the wife would "need[] additional training" at a cost for an increase in salary, it would not impute a higher salary to her.

A-0973-20

Considering these along with the remaining factors under the statute,[4] the court ordered an alimony award of $2,500 per month to the wife for a limited term of twelve years. The court refrained from ordering any modification of alimony based on pendente lite support provisions.

Lastly, the court ordered the husband to maintain the couples' life insurance policy with a death benefit of $600,000 naming the wife as beneficiary.

The court entered a final judgment of divorce on August 30, 2020, which incorporated the $2,500 monthly alimony award and the $600,000 life insurance policy obligation. The husband moved for reconsideration, arguing those sums were excessive. The court declined to reconsider the alimony award, but it did reduce the life insurance policy amount to $400,000.

This appeal by the husband ensued. He solely contests the alimony award and the life insurance amount. In particular, he argues the court erred in imputing $120,000 in annual income to him and in declining to impute a higher income to the wife.

---

[4] The remaining factors largely speak to other assets, pre-divorce support, and childcare, none of which speak directly to the imputed income issue at hand. These factors also contribute to child support and equitable distribution, discussed in the trial court's oral opinion but again not relevant here.

A-0973-20

II.

We begin by addressing the court's limited-duration alimony award and its associated determinations of the parties' respective earnings capacity. The pertinent law is well established.

Limited-duration alimony ("LDA"), also known as term alimony, consists of alimony payable for a specified period of time. The Legislature has expressly authorized LDA as a permitted form of alimony. N.J.S.A. 2A:34-23(c). LDA is generally appropriate in cases involving marriages of intermediate or shorter length, in which the spouse seeking support has an economic need, but also possesses" the skills and education necessary to return to the workforce" at some time in the immediate future. Gordon v. Rozenwald, 380 N.J. Super. 55, 66 (App. Div. 2005) (citing Cox v. Cox, 335 N.J. Super. 465, 483 (App. Div. 2000)).

A key purpose of LDA is to address a dependent spouse's post-divorce needs following intermediate or shorter-term marriages, in situations where permanent or rehabilitative alimony is not warranted but where economic assistance to the dependent spouse for a limited period of time is nevertheless justified. See Gnall v. Gnall, 222 N.J. 414, 431 (2015) (citing J.E.V. v. K.V., 426 N.J. Super. 475, 485-86 (App. Div. 2012)).

12

The alimony statute authorizes a court to consider the "earning capacity" of each party to a divorce or dissolution. N.J.S.A. 2A:34-23(b)(5). Pursuant to N.J.S.A. 2A:34-23(b)(5), that consideration implicates the respective parties' educational level, vocational skills, and employability, as well as the length of absence from the job market of the party seeking maintenance under N.J.S.A. 2A:34-23(b)(6). Louis & Seiden, N.J. Family Law, Volume II: Divorce, Alimony & Property Division, §24:4-2 (2021) (citing Miller v. Miller, 160 N.J. 408, 420 (1999), where the Supreme Court held that a party's "potential to generate income is a significant factor to consider when determining his or her ability to pay [support][,]" along with a number of other cases on point.)

A court may be required to impute income to a party who is unemployed, meaning the party is completely absent from the work force, or underemployed, meaning a party's current income is less than a previously demonstrated earning capacity. Id. at §24:4-2(a). A spouse's unemployment or underemployment must be regarded as voluntary for a court to impute income to that spouse. Ibid.; see also Tannen v. Tannen, 416 N.J. Super. 248, 261-62 (App. Div. 2010), aff'd o.b. 208 N.J. 409 (2011).

Unemployment or underemployment in this support context is deemed voluntary where it involves a "volitional, or intentional" decision by the

divorcing spouse to earn less than that spouse is demonstrably capable of earning. Id. at §24:4-2(a)(1). Imputing income is inappropriate where the decision to remain unemployed or underemployed was made with "just cause." Ibid. The assessment of "just cause" for voluntary unemployment or underemployment is to be "determined by an analysis of all of the relevant statutory factors" as is fair and reasonable under the circumstances. Ibid. Unemployment or underemployment is instead deemed involuntary, precluding imputation of income, when it is "attributable solely to events beyond the party's control." Ibid. (citing Dorfman v. Dorfman, 315 N.J. Super. 511, 517 (App. Div. 1998)).

Once it has been established that unemployment or underemployment is voluntary, the next step is to "determine the reasonable amount of income to be imputed to that party." Caplan v. Caplan, 182 N.J. 250, 270 (2005). That determination involves a "realistic[] apprais[al]" of the party's capacity to earn, considering educational background, employment experience, and job availability. Storey v. Storey, 373 N.J. Super. 464, 474-75 (App. Div. 2004). "Competent evidence" of earning capacity may include the party's record of prior earnings, or "data on prevailing wages from sources subject to federal notice." Ibid.

In assessing whether the trial court appropriately applied these principles in calibrating alimony here, we must be mindful that our scope of review is limited. We generally accord considerable deference to the Family Part's expertise in family matters and its exercise of discretion. See Cesare v. Cesare, 154 N.J. 394, 411-12 (1998); see also Pascale v. Pascale, 113 N.J. 20, 33 (1988). Deference is especially important where evidence is testimonial and involves credibility issues because the observing judge "has a better perspective than a reviewing court in evaluating the veracity of witnesses." Pascale, 113 N.J. at 33 (citations omitted). With respect to the pivotal issues before us, a trial judge's decision to impute income of a specified amount will not be overturned unless the underlying findings are "inconsistent with or unsupported by competent evidence." Overbay v. Overbay, 376 N.J. Super. 99, 106–07 (App. Div. 2005) (quoting Storey v. Storey, 373 N.J.Super. 464, 474–75 (App. Div. 2004)).

Viewed through this prism of appellate deference, we affirm the trial court's assessment of the parties' earning capacities and its resultant alimony award. The court's decisions have substantial support in the evidence and comport with the applicable law.

With respect to the husband, the trial court appropriately recognized that he had been employed for many years in the financial industry, attaining an

15

annual salary of nearly $200,000. The husband's steady earnings history did not change until a month before the trial when he was unexpectedly included in a company downsizing. As of the time of his trial testimony, the husband had been without work for only a few months and was in the midst of a job search. Too little time had passed for the court to deem him incapable of obtaining a substantial salary, and to consider his income capacity to be zero.

We realize that the husband did not have a job as of the time of his trial testimony. However, current earnings have never been viewed as "the sole criterion [upon which] to establish a party's obligation for support." Weitzman v. Weitzman, 228 N.J.Super. 346, 354 (App. Div. 1988) (citations omitted). Instead, "a court 'has every right to appraise realistically [a spouse's] potential earning power.'" Ibid. (citations omitted). To be sure, the husband was involuntarily terminated by his employer and had, in a short time, pursued new job opportunities. Even so, insufficient time passed to enable a declaration that he is incapable of restoring much or all of his previous salary.

The $120,000 annual income the trial court imputed to the husband was a fair compromise. The court did not impute to him the $200,000 in compensation he had been earning. Nor did it find he lacked an earning capacity despite his present joblessness. The $120,000 figure the court selected roughly corresponds

16

to slightly below the range of salaries the husband testified he was then pursuing in his job search, i.e., $125,000 to $140,000. We discern no inequity in the court's imputation. Moreover, as the trial court acknowledged, if the husband's unemployment or underemployment persists despite his best efforts, he can move to modify the alimony due to an alleged change in circumstances. Lepis v. Lepis, 83 N.J. 139, 145-46 (1980).

We likewise uphold the trial court's adoption of the wife's current $50,000 annual income. She only recently reentered the work force after over a decade as a stay-at-home parent. Even the husband's expert witness recognized that the wife's skill set needed to be updated with training in order for her to earn more. Her present salary is quite generous for a receptionist, and it would be speculative that she could readily obtain a higher-paying job without training. Again, if circumstances materially change, the husband can move for a future modification.

The $2500 monthly alimony figure selected by the court represents a $30,000 yearly boost in the wife's income and a corresponding $30,000 reduction in the husband's annual imputed income. As such, the amount roughly equalizes the parties' presumed incomes ($80,000 for the wife versus $90,000

A-0973-20

for the husband). The sums are within the zone of fair and equitable judicial discretion.

For all these reasons, the trial court's alimony determination is affirmed, without prejudice.

## III.

As a final brief point, we agree with the husband that a $400,000 face amount of the life insurance policy is greater than what is needed to assure the wife will be paid the alimony owed to her if the husband dies. The annual alimony of $30,000, times twelve years, amounts to a total liability of $360,000. That figure would be further reduced if discounted for present value. Given that the wife is amenable to reducing the $400,000 policy amount, we remand for the issue to be either settled or reexamined by the court.

Affirmed in part and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0973-20