**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2885-19

DANIELLE TIRENDI,

    Plaintiff-Appellant,

v.

THOMAS J. TIRENDI,

    Defendant-Respondent.

_____

Argued October 21, 2021 – Decided December 21, 2021

Before Judges Alvarez and Mawla.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hunterdon County, Docket No. FM-10-0320-14.

Bruce W. Clark argued the cause for appellant (Clark Michie LLP, attorneys; Bruce W. Clark and Christopher J. Michie, on the briefs).

Bonnie C. Frost argued the cause for respondent (Einhorn, Barbarito, Frost & Botwinick, PC, attorneys; Bonnie C. Frost, Jennifer Fortunato, and Jessie M. Mills, on the brief).

PER CURIAM

Plaintiff Danielle Tirendi appeals three post-divorce judgment orders dated June 28, 2019, October 23, 2019, and February 5, 2020. The Family Part judge entered the first order, accompanied by a written statement of reasons, after a twelve-day hearing. The second order and statement of reasons addressed plaintiff's reconsideration application; the third, defendant Thomas J. Tirendi's reconsideration application. We affirm.

The parties' April 29, 2014 divorce decree incorporated a matrimonial settlement agreement (MSA), which defendant unsuccessfully sought to set aside. See Tirendi v. Tirendi, No. A-1543-15 (App. Div. Sept. 18, 2017). The details regarding the parties' claims and personal circumstances, described in the earlier decision, need not be repeated here, except to reiterate the agreement was found to be enforceable. Tirendi, slip op. at 2-9. The parties have three children, born August 2003, July 2006, and April 2008. The children reside with their mother, and the parties share joint legal custody. The parties created 529 accounts during the marriage to save for the children's college expenses.

While married, the parties formed and operated a successful window component business, Velocity Marketing (VM). The business's success heavily depended on defendant's sales activity and various sales representatives working for commission throughout twenty-five states.

2

A-2885-19

Some of the MSA terms are relevant to this appeal. For instance, plaintiff was to receive three of defendant's retirement accounts: Vanguard -0614; Vanguard Roth -2763; T. Rowe Price SEP -3655; as well as the parties' non-retirement Vanguard brokerage account -5835.

Additionally, defendant indemnified plaintiff and was responsible for "all payments" on the parties' line of credit, which then had a balance of $25,906.58, and a $250,000 limit. Defendant kept his 2008 Jeep.

The MSA required the parties—at the appropriate time—to determine each parent's share towards the children's college expenses pursuant to Newburgh v. Arrigo, 88 N.J. 529 (1982). The 529 savings plans would reduce each party's contribution. Plaintiff was designated the custodian for those accounts.

Regarding alimony and child support, the MSA stated plaintiff would defer her right to these payments based on "the parties' continued ownership and operation" of VM. In the event VM was "sold or [plaintiff sold] her interest therein to [defendant,]" defendant would commence alimony and child support payments in an amount as agreed upon by the parties or determined by a court.

The MSA also stated that the parties' existing ownership allocation would be reversed. Plaintiff originally owned thirty percent of the business, and

3

defendant owned seventy percent. Going forward, plaintiff would now hold a seventy percent interest, while defendant would retain only thirty percent. Profits would be distributed accordingly.

An operating agreement signed incidental to the MSA included a covenant not to compete. Additionally, a non-solicitation provision barred the parties from encouraging employees or suppliers to alter their relationship with the company.

The operating agreement, which barred either party from selling without the other's approval, provided that plaintiff at her option could present defendant with a "sale notice" forcing him to buy her interest in VM. The purchase price would be seventy percent of the company's value, fixed at "three times the average annual gross revenues of the [c]ompany for the three . . . calendar years immediately preceding the [s]ale [n]otice . . . ." Ten percent of the purchase price would be due at closing, with the balance reduced to a Purchase Money Note. Payment would be made in sixty "quarter-annual" installments over a five-year period,[1] interest calculated at the prime rate plus two percent.

---

[1] In an apparent error, the MSA provided for sixty quarterly—rather than monthly—payments while calling for a five-year term.

4

The parties lived together for some time after the MSA was signed, in some respects still functioning as an intact family. Around the time plaintiff filed for divorce, she told defendant she wanted to build an indoor horse-riding arena at the marital residence. Accordingly, defendant signed a construction contract in March 2014. The parties paid the total cost of about $339,574 with the line of credit and their income.

In March 2015, defendant transferred his retirement accounts to plaintiff, believing he was complying with the MSA. He mistakenly included two additional retirement accounts not listed on the MSA: T. Rowe Price -1869 and Vanguard -5844, which totaled $571,965. He failed to transfer one account, Vanguard Roth -2763, which had a balance of $8,397 by November 2018. In all, defendant transferred more than one million dollars to plaintiff.

The parties retained Hubert Klein, CPA, to calculate the operating agreement value of VM as well as its actual value. Klein prepared valuation schedules for VM but did not draft a formal report. Using the terms of the operating agreement, Klein fixed the value of the company at $3,893,004, or three times its average gross revenue for the preceding three years, $1,297,668. Klein thus concluded that the value of plaintiff's seventy-percent interest under this formula rounded up to $2,730,000.

A-2885-19

However, Klein's second valuation used an alternative method, which valued one hundred percent of the membership interest at $1,734,102, and rounded plaintiff's seventy percent interest to $1,214,000.

Klein utilized a third method—valuing the company at $1,911,380. Under this method, plaintiff's seventy percent interest rounded to $1,338,000.

Throughout 2016 and 2017, the parties had difficulties managing VM, including disputes about sales commissions. They also clashed regarding defendant's business expenses and company vehicle.

On November 6, 2017, defendant wrote to VM submitting his "resignation as an employee[.]" He further "waiv[ed] and assign[ed]" to plaintiff his "[thirty percent] ownership interest in lieu of future alimony and child support obligations . . . ." The same day, defendant withdrew $60,429.58 from the VM bank account.

The following day, Velocity Marketing North, an independent contractor working for VM, terminated relations between the two companies. Velocity Marketing South and Velocity Marketing Midwest similarly terminated relations with VM the same day.

On November 15, 2017, plaintiff's counsel wrote to defendant's counsel, tendering the sale notice contemplated in the MSA and operating agreement.

A-2885-19

The notice demanded a purchase price of $2,730,000 based on Klein's report, with ten percent due at closing on December 18, 2017, and the balance due in sixty consecutive monthly installments. Defense counsel rejected the sale notice on November 20, 2017, alleging that defendant "gave [plaintiff] his [thirty percent] interest in the business in lieu of making future alimony and child support payments."

In December 2017, the family court heard motions by both parties and imputed $240,000 in gross annual income to defendant, ordering him to make weekly pendente lite payments of $1,100 for alimony and $308 for child support. Around this time, defendant started a new business: Velocity Sales, LLC (Velocity), an "independent rep organization" in the window and door industry operating in five states. The new company was "smaller" and employed fewer "subreps" than VM. The motion judge observed that defendant took most of VM's business with him when he abruptly quit.

Plaintiff filed a case information statement (CIS) on November 7, 2018. She reported total gross assets of $2,825,147, and total gross liabilities of $426,254. Among these assets were a TD Bank checking account containing $67,165, and a VM account containing $147,941, both of which contained at least some funds belonging to defendant, described in more detail below. Her

7

annexed federal income tax returns showed gross earned income for 2017 of $515,355. She reported that her then-current lifestyle expense, including the costs associated with the children, was $11,076 per month. Going forward, plaintiff estimated prospective lifestyle expenses of $23,689 per month.

Defendant filed a CIS on November 6, 2018. He reported gross assets of $176,929, and gross liabilities of $179,907. His annexed 2017 federal income tax returns showed gross earned income of $231,053, and that he earned $208,000 in the first ten months of 2018. His then-current lifestyle cost $24,041 per month and his prospective lifestyle cost an estimated $22,221 per month.

The twelve-day plenary hearing lasted from November 2018 through February 2019. Because the financial disputes required some historical context, defendant testified regarding the marital residence purchased for $370,000 in November 2001 with joint funds and an approximate $300,000 mortgage. The parties nearly doubled the size of the home, adding an inground pool, pool house, and horse barn. In 2014, the indoor riding arena was completed. At the time of the plenary hearing, the line of credit balance attributable to the construction of the riding arena was $179,906.

Defendant claimed plaintiff handled the couple's finances during the marriage. In late 2015, he realized she was depositing her salary checks in an

A-2885-19

individual account. Both parties paid personal taxes from the VM account. Plaintiff paid her legal fees from the VM account, and defendant attested to sometimes using plaintiff's Mastercard paid from joint funds.

Defendant described the difficulties in operating the business with plaintiff and the frustrations expressed by independent contractors in dealing with her. She sometimes contacted sales representatives directly, which conflicted with defendant's management strategy. When defendant's work vehicle needed to be replaced in late 2017, plaintiff objected, characterizing the car as a fringe benefit and suggesting defendant purchase a smaller vehicle that he felt was inadequate for the job. Defendant further alleged plaintiff delayed reimbursing travel expenses, defendant's monthly draw, and the cost of demonstration materials.

Defendant saw no alternative but to resign from the company, and claimed he did not start Velocity until the court released him from the non-compete covenant. He estimated his 2018 income to be approximately $250,000. He lived in a rented apartment during that time.

Plaintiff testified that she put defendant's salary into joint accounts to fund family expenses. She began issuing herself salary checks in January 2014. Plaintiff deposited some of these checks into her personal TD Bank accounts, at

A-2885-19

least one of which she opened on February 7, 2014. She deposited a total of $372,000 in salary checks into her personal TD accounts from February 7, 2014, through November 5, 2015.

Plaintiff transferred some of these funds, including payments of $10,000 and $43,000, to defendant's retirement accounts. She testified that additional amounts from her TD accounts were also supposed to be transferred to defendant's retirement accounts. But as of November 7, 2018, $67,165 remained in her TD checking account, at least some of which was intended for defendant.

When defendant resigned in November 2017, plaintiff's net worth was approximately two million dollars. Following the divorce, she received about $500,000 per year in income from the business, while defendant received about $250,000 to $300,000 in income from the business. Plaintiff acknowledged that her own income increased each year from 2014 through 2016. She testified that defendant's resignation "completely devastated" the company and "destroyed [her] income stream" because several of their representatives and window manufacturers terminated relations immediately following defendant's resignation. Nonetheless, plaintiff took $196,934.73 in salary from VM from January 1, 2018, through November 2, 2018. Her net worth at the time of the plenary hearing was $2.1 million.

10

Plaintiff testified that VM earned $1,431,567 in 2016. Of that, $1,032,502 remained after payments to the "subreps." Other business expenses, such as auto and insurance, reduced the remaining total to approximately one million dollars. Plaintiff believed defendant could earn that sum annually going forward because of his industry connections. She also believed defendant had not provided his true income with Velocity because he did not provide a list of the companies that he represents. Plaintiff is now a licensed realtor; however, her employer has declined to assign her any work until the matrimonial litigation is resolved. She estimated she would earn $5,000 in 2019 as a realtor. In 2018, plaintiff rented the pool house at the marital residence to her son's friend, yielding total annual income of $14,700. She also earned approximately $2,380 from boarding horses at the marital residence.

Plaintiff testified that the family lifestyle in 2012 and 2013 came to approximately $40,207 per month, of which $7,500 was savings and investments. Her current lifestyle costs were $11,075 per month. She estimated a prospective lifestyle monthly budget, following the divorce, of $23,689. Plaintiff owed $38,000 on a Bank of America credit card, reflecting consolidation of the debts on previous credit cards.

11

Plaintiff sought child support for the period of the VM buyout. The children's health insurance costs totaled approximately $1,200 per month, and the children's various sports incurred additional expenses. Additionally, plaintiff wanted to register them for summer camps which cost between $4,000 and $5,000 per year for one child alone.

On cross-examination, plaintiff admitted defendant was not required to transfer all of his retirement accounts to her. He needed only transfer three accounts named in the MSA, which he had done. Plaintiff also acknowledged that if defendant had to buy out her interest in VM, he was entitled to VM's assets, including the bank account described in her CIS.

Paul White testified for plaintiff as an expert in forensic accounting. He described his forensic investigation report as having the purpose to "rebut the defendant's allegations of monies that were owed to him." He reviewed the parties' financial records in detail.

White addressed defendant's March 2016 allegations that plaintiff "embezzled" from his "earnings and business expense reimbursements" between January 2014 and February 2016 to pay for her expenses and those of the children. He also described defendant's allegation that plaintiff "embezzled"

A-2885-19

$108,667.76 from his "earnings and business expense reimbursements" to fund the construction of the indoor riding arena.

Regarding the line of credit for the indoor riding arena, White determined that defendant issued the first check for construction of the arena in April 2014, along with a second check in October 2014. White therefore opined that the cost of the indoor riding arena was a joint expense.

White determined that the operating agreement's call for a 70-30 income split in plaintiff's favor was not effectuated in 2014 and 2015. He also found that plaintiff spent $117,029 on defendant's Discover card and that defendant owed plaintiff $2,849 for his personal use of her Bank of America cards. In sum, White testified that after considering the excess salary payments, as well as the credit card usage and other items in his report, defendant owed plaintiff an equalization payment of $314,520.

On June 28, 2019, the judge fixed the value of plaintiff's seventy percent interest in VM at $2,730,000, consistent with the operating agreement. Based on this figure, the court ordered defendant to pay plaintiff $2,494,143, reflecting certain credits, for her interest in VM.

The court awarded defendant three credits: $147,941, $33,582, and $54,334. The $147,941 credit represented "the funds in VM's account at the

13

time [defendant] resigned" pursuant to plaintiff's November 7, 2018 CIS, because plaintiff testified on cross-examination that "these funds should go to [defendant]." The court wrote that defendant claimed that there was $370,664 in the VM account, but the court "does not know where [that amount] came from" and if these funds were a VM asset, then defendant was "owed an additional credit." The $33,582 credit represented one-half of the value of plaintiff's TD checking account, which plaintiff testified contained funds intended to be deposited into both parties' retirement accounts. The $54,334 credit represented one-half of the additional funds spent on the riding arena, awarded because "[b]oth of these parties made the decision to spend these monies" but it was "inequitable, fundamentally unfair, for [plaintiff] to reap all of the benefits of this capital improvement . . . ."

The order was silent as to the ten percent down payment and associated interest payments required by the operating agreement. The buyout payments were to be made quarterly in $50,000 increments for nearly fourteen years. In light of these payments, the court refused to impose an alimony obligation, but directed defendant to pay $100 per week in child support. Defendant was awarded the return of two retirement accounts, Vanguard -5844 and T. Rowe

Price -1869. He was directed to transfer the Vanguard IRA worth $8,397 to plaintiff.[2]

The court held defendant was responsible for $25,906.58 of the balance owed on the line of credit, while plaintiff was responsible for the remainder. The judge did not award counsel fees.

Plaintiff's first motion for reconsideration requested the judge enforce defendant's obligation to pay ten percent down on the VM purchase price as well as interest on the balance. She also requested that the value of the T. Rowe Price and Vanguard accounts be credited against defendant's buyout obligation, and that the judge revisit the denial of alimony and the child support award. She asked that the judge order use of the 529 account towards the oldest child's private school education, shift all responsibility for the line of credit to defendant, and order defendant to provide copies of Velocity's quarterly sales records along with copies of his personal and business tax returns.

Defendant opposed the motion and cross-moved to amend the $147,941 credit for funds in the VM account to $376,312.61, suggesting that there were additional earned funds yet to be deposited at the time of his resignation. He

---

[2]  It appears that this account is Vanguard Roth IRA -2763 referenced in the MSA, which was never previously transferred to plaintiff.

argued that the amended credit reduced the total buyout obligation to $2,265,771.39. Defendant sought to enjoin plaintiff from dissipating the children's 529 accounts, requesting that the funds be allocated equally toward each parent's college expense obligations as called for by the MSA. He also sought counsel fees.

The parties submitted a shared parenting worksheet based on the child support guidelines. Plaintiff's worksheet showed gross taxable income of $1,606 per week, and $7,692 per week for defendant, and a basic child support amount of $802 per week. In a given year, the children were listed as spending 239 overnights with plaintiff, and 126 overnights with defendant. Based on the worksheet calculations, defendant's net child support obligation was $480 per week.

The judge denied the motion in part on October 23, 2019. At the earlier oral argument, the judge stated he "rejected the position that [the MSA was] unenforceable[,]" and was merely "interpret[ing]" the MSA.

The judge refused to credit the two retirement accounts against the buyout price and ordered interest to accrue at the rate stated in the operating agreement beginning October 23, 2019, the date of his decision. The court also refused to impose retroactive interest because plaintiff had been in "improper possession

of substantial assets of [defendant's], hundreds of thousands of dollars in retirement benefits and VM monies. It would be unfair and inequitable to award her substantial interest during a timeframe when she improperly had so much of [defendant's] money."

The judge said he erred in omitting the buyout down payment and ordered defendant to pay it, calculating that defendant would be able to fund the ten percent payment "with the appropriate credit for monies he will receive from the VM buyout (he is entitled to $376,312.61)."[3] Thus he granted defendant's request to adjust credits to the buyout price based on the amount in the VM account. The judge denied modification of child support, but noted that his decision did not preclude plaintiff from seeking alimony in the future.

The court denied reconsideration of the ruling on the line of credit and denied plaintiff's request for defendant's financial records. The judge ordered plaintiff to transfer $571,965 in retirement funds, plus any gains, to defendant. He directed that the 529 accounts be allocated against each party's college expense obligation while the children are in college.

---

[3] The face of the order states that the credit awarded is $376,312.61, but the accompanying statement of reasons says the credit is $370,664. In any event, plaintiff later stipulated to a credit of $370,664 and defendant does not dispute that amount.

Finally, on February 5, 2020, the court fixed the buyout price, with consent of the parties, at $2,271,420. He vacated the ten percent down payment provision found in the earlier order to "comport with the parties' proper understanding[,]" since plaintiff's counsel had written to defendant's counsel acknowledging that the ten percent down payment had already been paid. Plaintiff's counsel's letter confirmed a November 6, 2019 on-the-record discussion. Defendant was to make $50,000 quarterly payments to plaintiff, which would include both principal and 2.5 percent interest, beginning July 18, 2019.

The judge acknowledged on reconsideration that including plaintiff's desired interest, the purchase price for VM came to $3,741,029.91—an unconscionable figure in light of Klein's report showing the actual value of plaintiff's interest in VM to be $1,337,966. The operating agreement's interest provisions were unconscionable "given the financial disparity between the parties, with [plaintiff] having, at least at the time of the hearing, substantially superior financial circumstances, [thus] the court deems a flat rate of 2.5 [percent] to be fair and equitable." The judge appointed a certified public accountant to calculate gains and losses on the retirement funds relative to the transfer.

The judge did not credit plaintiff's embezzlement claims and limited defendant's payment on the line of credit balance to $25,906.58. Both parties were denied counsel fees.

On appeal, plaintiff alleges the following errors:

POINT I

THE TRIAL COURT ERRED IN DISREGARDING THE APPELLATE DIVISION'S BINDING RULING THAT THE MARITAL SETTLEMENT AGREEMENT IS NOT UNCONSCIONABLE AND "SHOULD BE ENFORCED."

A.    The Appellate Division Ruling Controls This Case.

    1.    The appellate ruling is final and binding on the parties and the trial court.

    2.    The appellate ruling encompasses the MSA terms the trial court later modified.

B.    The Trial Court Had No Valid Basis In Law Or Fact For Modifying The MSA.

    1.    The trial court lacked legal or equitable authority to modify the MSA.

    2.    The trial court lacked adequate evidence to modify the MSA.

        a.    The evidence did not support relieving [d]efendant of his obligation to pay the entire amount of the parties' line of credit.

19        A-2885-19

b. The evidence did not support relieving [d]efendant of his obligation to transfer all retirement accounts to [p]laintiff.

c. The trial court's modifications of the terms of [d]efendant's buyout of [p]laintiff's share of their business were erroneous and arbitrary.

i) The court erroneously and arbitrarily modified the terms of [d]efendant's buyout of [p]laintiff's share of their business.

ii) The court erred in concluding the interest rate on the buyout amount was unconscionable.

iii) The court erred in granting [d]efendant a credit for all money in the business bank account on an arbitrary date.

POINT II

THE TRIAL COURT ERRED IN CALCULATING CHILD SUPPORT.

A. The Trial Court Erred By Failing To Impute As Defendant's Income His Proven Earning Capacity And By Instead Imputing An Arbitrary And Unexplained Amount.

B.    The Trial Court Erred In Finding That Plaintiff Had Received And Would Receive Enough Money To Support The Parties' Children.

C.    The Trial Court Erred In Allocating Credit For The Parties' 529 Plans Without Evidence Or Explanation.

POINT III

THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO IMPOSE ON DEFENDANT AN OBLIGATION TO REGULARLY DISCLOSE TO PLAINTIFF HIS AND HIS COMPANY'S INCOME.

POINT IV

THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO AWARD TO PLAINTIFF THE ATTORNEY'S FEES SHE NEEDLESSLY INCURRED TO RELITIGATE ISSUES ALREADY RESOLVED BY THE APPELLATE DIVISION.

I.

It is undisputed that we previously found the MSA to be enforceable. But "[t]he equitable authority of courts to modify property distribution, alimony, and support orders issued in divorce cases is well established." Conforti v. Guliadis, 128 N.J. 318, 323 (1992). Even when a divorce order incorporates agreements reached privately between the parties, such orders can be modified "'in light of all the facts' bearing on what is 'equitable and fair.'" Ibid. (quoting Smith v. Smith, 72 N.J. 350, 360 (1977)). Marital settlement agreements must "serve the

21

strong public and statutory purpose of ensuring fairness and equity in the dissolution of marriages." Ibid. The law "'grants particular leniency to agreements made in the domestic arena,' thus allowing 'judges greater discretion when interpreting such agreements.'" Sachau v. Sachau, 206 N.J. 1, 5 (2011) (quoting Guglielmo v. Guglielmo, 253 N.J. Super. 531, 542 (App. Div. 1992)). And "only those agreements that are 'fair and just' will be enforced." Addesa v. Addesa, 392 N.J. Super. 58, 66 (App. Div. 2007) (quoting Petersen v. Petersen, 85 N.J. 638, 642 (1981)). A court may decline to enforce an oppressive or harsh provision. Michalski v. Michalski, 50 N.J. Super. 454, 466-67 (App. Div. 1958).

Marital settlement agreements are subject to "judicial supervision and enforcement . . . but only to the extent that they are just and equitable." Quinn v. Quinn, 225 N.J. 34, 48 (2016). More precisely, a "narrow exception to the general rule of enforcing settlement agreements as the parties intended is the need to reform a settlement agreement due to 'unconscionability, fraud, or overreaching in the negotiations of the settlement[.]'" Id. at 47 (quoting Miller v. Miller, 160 N.J. 408, 419 (1999)). Reformation is permitted when a court finds the terms of a marital settlement agreement unfair or inequitable. Miller, 160 N.J. at 418.

"Because of the family courts' special jurisdiction and expertise in family matters," we accord great deference to family court factfinding. Cesare v. Cesare, 154 N.J. 394, 413 (1998). The Family Part's findings of fact are binding on appeal when supported by adequate, substantial, and credible evidence. Id. at 411-12.

We defer to the Family Part's discretion to decide issues pertaining to the division of marital assets. La Sala v. La Sala, 335 N.J. Super. 1, 6 (App. Div. 2000). The party seeking to modify equitable distribution must clearly and convincingly prove that the settlement agreement is unconscionable under the circumstances. Conforti, 128 N.J. at 322. Defendant's bid to establish overall unconscionability failed. However, the court largely preserved the parties' agreement and only modified the terms of the MSA and the operating agreement which were not equitable or fair in light of intervening events. For example, beginning with the line of credit, the MSA clearly made defendant responsible for the obligation. But it did not oblige him to pay all balances incurred on that account into perpetuity. When he signed the MSA, it had a balance of $25,906.58. Afterward, the parties increased the line of credit. Nonetheless, the riding arena is an improvement that ultimately benefits only plaintiff. We

therefore agree with the judge that it would be inequitable to require defendant to pay more than the balance remaining when the MSA was signed.

The judge decided that half of the $108,000 paid towards the expenses of construction from other sources would be credited to each party. The judge's decision is a common sense interpretation of the MSA language. He did not modify the agreement, but merely interpreted an ambiguity. It was clearly in the scope of his authority to do so. See generally Pacifico v. Pacifico, 190 N.J. 258 (2007).

Plaintiff claims a mutual mistake occurred in the drafting of the MSA as the parties intended to transfer all of defendant's retirement accounts to her. The agreement, prepared by plaintiff's attorney, did not specify the transfer of defendant's T. Rowe Price account -1869, or his Vanguard -5844 account. Defendant misinterpreted the MSA to mean he had to transfer those accounts as well. His misunderstanding of a document he admits he did not read before signing should not control. Most consequentially, agreements are construed against the drafter. Id. at 267-68 (acknowledging that marital settlement agreements, like other contracts, are to be construed against the drafter absent both parties' involvement). Here, it is reasonable to construe the omission of these accounts against plaintiff, not defendant. Thus, it was not error for the

court to read the MSA as written and direct the return of accounts that defendant mistakenly transferred to plaintiff.

Plaintiff also challenges each aspect of the judge's orders with respect to the buyout. After our review of the record, we see no error. The court essentially made ministerial changes intended to balance the equities and give the MSA its plain meaning, given that plaintiff was mistakenly in possession of hundreds of thousands of defendant's funds. With regard to the payment schedule, the judge stated:

> The [operating agreement] payment schedule is untenable, given [defendant's] financial circumstances. Since the [operating agreement] is incorporated into the MSA, the court has the power, through its power to make equitable distribution, to order a new payment schedule. [Defendant] shall pay [plaintiff] the $2,730,000 (minus credits) at the rate of $200,000 per year until the balance is paid. He will make payments to her quarterly, with $50,000 paid by March 1, June 1, September 1, and December 1 of each year.

The court reasonably directed the quarterly payments to begin following its February 5, 2020 decision, rather than retroactively using the date of the sale notice. It would otherwise have been an inequitable burden on defendant.

The court's October 23, 2019 order regarding the calculation of interest was also reasonable. The judge rejected retroactive payments because plaintiff wrongfully possessed defendant's substantial assets—"hundreds of thousands of

25

dollars in retirement benefits and VM monies." It would be "unfair and inequitable to award her substantial interest during a timeframe when she improperly had so much of his money." Ultimately the court did award some retroactive interest—but only from July 18, 2019, because the issue was not raised until plaintiff moved for reconsideration on that date. The judge initially directed interest be paid at the rate in the operating agreement, but reconsidered when defendant filed his own motion, fixing the interest rate on the buyout at 2.5 percent.

According to the judge, plaintiff belatedly raised the interest issue. As the judge calculated it, the interest sought by plaintiff would "impose[] on [defendant] approximately $1 million or $3 million more in obligations than the court envisioned in its June 2019 decision[,]" and the court already considered the buyout price high in light of Klein's alternative valuations. Plaintiff's requested buyout price of $2,730,000 would come instead to the inequitable and unconscionably high total of $3,741,029.91. Thus, he reformed the interest rate to a flat 2.5 percent. The judge had the authority to alter those terms. See Conforti, 128 N.J. at 323; Addesa, 392 N.J. Super. at 66; Michalski, 50 N.J. Super. at 466-67.

Plaintiff also contends that the court erred in granting defendant a credit for the money in the business account on an allegedly arbitrary date. The court's June 28, 2019, order awarded defendant "a credit for the VM assets in existence at the time of the resignation and buy-out." Thus, he was awarded a credit of $147,941 for the funds "in the VM bank account" based on plaintiff's CIS and her testimony that defendant was entitled to those funds, though defendant contended that this amount was actually higher. The order stated that defendant could seek the full credit claimed of $370,644 "by consent or in a future application."

In its October 23, 2019 order, the court amended the credit to $376,312.61.[4] Plaintiff thereafter stipulated in her December 5, 2019 certification "to the [d]efendant's principal [purchase price] of $2,271,420 . . . ." This figure included credits of $33,582, $54,334, and the very credit which plaintiff now appeals, $370,664, for money in the VM account. Plaintiff cannot reasonably object to these credits included in the stipulated buyout price. Judicial estoppel precludes a party from "asserting a position in a case that contradicts or is inconsistent with a position previously asserted by the party in

---

[4] The statement of reasons says the credit should be $370,644, which conflicts with the order.

the case or a related legal proceeding." Newell v. Hudson, 376 N.J. Super. 29, 38 (App. Div. 2005) (quoting Tamburelli Props. v. Cresskill, 308 N.J. Super. 326, 335 (App. Div. 1998)).

II.

Plaintiff claims that the trial court erred in:  calculating child support; imputing income to defendant; finding she would receive enough funds to support the children; and allocating credit for the parties' 529 plans.

In its June 28, 2019 opinion, the court cited defendant's testimony that as of November 6, 2018, he grossed $208,000 in the first ten months of his new business.  The judge said he found it "difficult to accept [defendant's] testimony regarding his income.  He is an admitted liar, even while he is testifying under oath. . . .  He has a serious credibility problem."  The court additionally found that "[b]oth of these parties have credibility problems."

The judge wrote that the income he previously imputed of $240,000 per year pendente lite was no longer a "reasonable amount."  He credited plaintiff's testimony that after paying subreps, VM netted approximately one million dollars per year, though he was "not convinced" that defendant should be imputed the full amount, as such a figure was not "demonstrated" at the plenary hearing.

A-2885-19

Nonetheless, the court acknowledged that defendant had a "proven track record of a lucrative and stable earning capacity[,]" having "generated revenues in excess of $1.2 million each year" at VM before payments to subreps. Defendant's new company performed "the same work, in the same industry, with the same business contacts, in the same geographic areas," though on a smaller scale. And, defendant had "stonewalled" discovery to prevent both plaintiff and the court "from learning the full scope and true income of his business." The court further found that defendant can earn more than he stated because "[h]e earned that when he was receiving [thirty percent] of the VM compensation." Without further calculations, the court concluded that defendant has the ability to earn $400,000 per year.

Imputation of income is in the discretion of the court, based upon the evidence presented. Sternesky v. Salcie-Sternesky, 396 N.J. Super. 290, 307-08 (App. Div. 2007). It "is a discretionary matter not capable of precise or exact determination but rather requiring a trial judge to realistically appraise capacity to earn and job availability." Storey v. Storey, 373 N.J. Super. 464, 474 (App. Div. 2004). There are no bright line rules that govern the imputation of income. Ibid. On appeal, a trial judge's decision "will not be overturned unless the underlying findings are inconsistent with or unsupported by competent

evidence." Id. at 474-75. Thus, a trial court's imputation of income for support purposes is subject to an abuse of discretion standard. See Tash v. Tash, 353 N.J. Super. 94, 99-100 (App. Div. 2002).

The judge imputed a reasonable amount of income to defendant. Although approximated, the court's figure is consistent with VM's earnings and defendant's unchallenged testimony that Velocity operates on a smaller scale than VM. Defendant testified that he earned $208,000 in the first ten months operating Velocity. The court reasonably found that figure to be low, in light of the scant information which defendant provided and his proven earnings history. And the record shows it is probable that defendant's earnings will increase as his new business grows.

Defendant did not testify that he voluntarily reduced his income—only that Velocity operated on a smaller scale. Naturally, a newer and smaller company that only covers five states will generate lower income than a larger well-established company that covers twenty-five. The court was well within its discretion to decide that defendant could earn $400,000 annually—more than he acknowledged, yet less than his prior earnings.

In setting the amount of child support, the court analyzed the factors in N.J.S.A. 2A:34-23(a), finding that the children's expenses totaled $9,527 per

month. Regarding the standard of living of each parent, the court found that plaintiff enjoys a "substantially higher" standard of living and has "substantially more assets" than defendant. The court used the $400,000 of imputed income for defendant. Regarding the needs of the children, the court recognized that the parents intend for the children to attend college, that the children have no income or assets and do not work, that the parents have no court-ordered support for others, and that the children do not have any debts or liabilities, noting the parties had debts. The court considered other statutory factors.

The judge observed that given the "unusual agreement" between the parties regarding VM, the "guidelines are not helpful." The $200,000 annual buyout payment "has elements of equitable distribution, spousal support, and child support[,]" and the parties' arrangement "does not fit the child support guidelines model." The court elected to deviate from the guidelines to preserve fundamental fairness. The court concluded that plaintiff will be "well able to support these three children" in a manner which is "at, or at least very close to, the marital standard of living" through the buyout payments. Thus, the court awarded $100 per week in child support. The court confirmed its award in ruling on the initial motion for reconsideration, writing, "there should be a substantial

31

deviation from the guidelines because [plaintiff] is receiving millions from the VM buyout (in addition to the millions she has received since the divorce)."

Child support awards and modifications are entrusted to the sound discretion of the trial court; we review for abuse of discretion. Innes v. Innes, 117 N.J. 496, 504 (1990). A child support award will not be set aside unless shown to be unreasonable, unsupported by substantial evidence, or "the result of whim or caprice." Tannen v. Tannen, 416 N.J. Super. 248, 278 (App. Div. 2010) (quoting Foust v. Glaser, 340 N.J. Super. 312, 315 (App. Div. 2001)). A court must attach a guidelines worksheet and provide a statement of reasons. Fodero v. Fodero, 355 N.J. Super. 168, 170 (App. Div. 2002).

A judge has discretion to supplement the child support award where the family income exceeds the maximum income amount in the guidelines utilizing the N.J.S.A. 2A:34-23(a) factors. Child Support Guidelines, Pressler & Verniero, Current N.J. Court Rules, Appendix IX-A to R. 5:6A, www.gannlaw.com (2021). See also Isaacson v. Isaacson, 348 N.J. Super. 560, 581 (App. Div. 2002).

A court may also deviate from the guidelines when good cause demonstrates that adherence would be inappropriate. Ribner v. Ribner, 290 N.J. Super. 66, 73 (App. Div. 1996). When a court "finds that the guidelines are

inappropriate in a specific case, it may either disregard the guidelines or adjust the guidelines-based award to accommodate the needs of the children or the parents' circumstances." Pressler, Appendix IX–A.

The court here properly considered the factors found in N.J.S.A. 2A:34-23(a), keeping in mind that the guidelines were not helpful in light of the $200,000 annual payment for the buyout of VM, which encompassed alimony and child support. The awards, including the buyout and child support, yield plaintiff $17,100 per month—a reasonable sum between the amounts in her CIS indicating that her lifestyle required income of $11,076 per month, with prospective expenses of $23,689 per month. It greatly exceeded the $9,527 the court found more accurately represented the children's monthly needs. Furthermore, plaintiff's November 2018 CIS reported assets totaling $2,825,147 with only approximately $400,000 in liabilities. The court's determination was proper.

With regard to the 529 plans, the MSA required the parties to calculate their respective contributions at the time pursuant to Newburgh, 88 N.J. at 529. Each parent's share would be reduced by the amount of any 529 plan. On reconsideration, the court found the MSA clear, and each party was expected to

contribute to the children's college expenses.  The fact plaintiff was made custodian of the accounts in no way lessened her responsibility to contribute.

The court rejected plaintiff's application based on the clear and unmistakable language of the MSA.  We see no reason to disturb the parties' agreement as to their children's college savings.

## III.

Plaintiff asserts that the court erred in not requiring defendant to provide ongoing documentation of his personal and business income.  We find the court's decision reasonable.  The cases plaintiff relies upon require documentation when some idiosyncratic factor exists.  None exists here.  Defendant has not established a basis for such extraordinary relief.  See Walles v. Walles, 295 N.J. Super. 498, 518-19 (App. Div. 1996) (only particular facts warrant the extraordinary relief requiring a litigant to disclose his or her income).

## IV.

The court analyzed each of the factors in Rule 5:3-5(c) in its initial opinion regarding counsel fees.  Plaintiff was in a superior financial position and "ha[d] the ability to immediately pay all of the fees that she owe[d]."  Both parties "took unreasonable positions with respect to different issues" and "[e]ach party prevailed with respect to different issues."  The court found defendant incurred

$352,669.79 in legal fees, while plaintiff incurred $533,133 in legal fees and $27,586.46 in expert fees. Plaintiff was previously awarded $6,750 in legal fees in June 2018. Plaintiff actually paid $366,366.43 in legal fees and $19,173.50 in expert fees. Plaintiff "misspent everyone's time" during the plenary hearing with "persistent refusal[s] to answer questions . . . ." On balance, the court found that these factors "militate for fees paid by each [party] to the other." Hence the court ultimately declined to award counsel fees.

Rule 4:42-9 permits an award of fees in a family action based on a weighing of the following factors set forth in Rule 5:3-5(c):

> (1) the financial circumstances of the parties; (2) the ability of the parties to pay their own fees or to contribute to the fees of the other party; (3) the reasonableness and good faith of the positions advanced by the parties both during and prior to trial; (4) the extent of the fees incurred by both parties; (5) any fees previously awarded; (6) the amount of fees previously paid to counsel by each party; (7) the results obtained; (8) the degree to which fees were incurred to enforce existing orders or to compel discovery; and (9) any other factor bearing on the fairness of an award.

The award of counsel fees and costs in matrimonial actions rests in the sound discretion of the trial court. Williams v. Williams, 59 N.J. 229, 233 (1971). Fees will not be disturbed in the absence of a showing of abuse. Berkowitz v. Berkowitz, 55 N.J. 564, 570 (1970). "We will disturb a trial court's

determination on counsel fees only on the 'rarest occasion,' and then only because of clear abuse of discretion[,]" <u>Strahan v. Strahan</u>, 402 N.J. Super. 298, 317 (App. Div. 2008) (quoting <u>Rendine v. Pantzer</u>, 141 N.J. 292, 317 (1995)), or a clear error in judgment. <u>See</u> <u>Tannen</u>, 416 N.J. Super. at 285. Where case law, statutes and rules are followed and the judge makes appropriate findings of fact, the fee award is entitled to deference. <u>Yueh v. Yueh</u>, 329 N.J. Super. 447, 466 (App. Div. 2000); <u>see also</u> Pressler & Verniero, <u>Current N.J. Court Rules</u>, cmt. 4.7 on <u>R</u>. 5:3-5 (2022); <u>J.E.V. v. K.V.</u>, 426 N.J. Super. 475, 493-94 (App. Div. 2012).

One consideration in making an award of fees is whether a party acted in bad faith throughout the litigation. <u>Borzillo v. Borzillo</u>, 259 N.J. Super. 286, 291-94 (Ch. Div. 1992); <u>Williams</u>, 59 N.J. at 233. Bad faith may include misuse or abuse of process, seeking relief which one knows or should know that no reasonable argument could support, intentional misrepresentation of facts or law, and vexatious, wanton, or oppressive actions of a losing party. <u>Borzillo</u>, 259 N.J. Super. at 293-94. And counsel fees may be awarded when a party has unnecessarily prolonged the litigation. <u>Marx v. Marx</u>, 265 N.J. Super. 418, 429 (Ch. Div. 1993).

Here, the court appropriately considered <u>Rule</u> 5:3-5(c) and found the parties' animosity and unreasonable positions extended the litigation, causing substantial legal fees such that neither party was entitled to compensation. The decision was not an abuse of discretion.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2885-19